SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-01-0091-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR1999-015293 |
| EUGENE ROBERT TUCKER, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | **O P I N I O N** |

Appeal from the Superior Court in Maricopa County,
The Honorable Michael D. Jones, Judge

**CONVICTIONS AND ALL SENTENCES EXCEPT SENTENCES OF DEATH AFFIRMED
AND DEATH SENTENCES REMANDED FOR RESENTENCING**

Janet A. Napolitano, Former Attorney General,                    Phoenix
Terry Goddard, Attorney General
     By:  Kent E. Cattani, Chief Counsel,
          Capital Litigation Section
    and: Dawn M. Northup, Assistant Attorney General
          Robert L. Ellman, Assistant Attorney General
          James P. Beene, Assistant Attorney General
          John P. Todd, Assistant Attorney General
          Bruce M. Ferg, Assistant Attorney General        Tucson
Attorneys for Appellee

James J. Haas, Maricopa County Public Defender              Phoenix
     By:  Christopher V. Johns, Deputy Public Defender
          James H. Kemper, Deputy Public Defender
Attorneys for Appellant

**R Y A N**, Justice

¶1      Eugene Robert Tucker was convicted of three counts of first degree murder for the July 15, 1999, deaths of AnnMarie Merchant, Roscoe Merchant, and Cindy Richards.  Tucker was also

found guilty of sexual assault, kidnapping, and burglary in the first degree. He was sentenced to death for each of the first degree murder counts. Tucker received the following sentences for his other crimes: Twenty-five years to life for the sexual assault conviction, twenty-one years for the kidnapping conviction, and twenty-one years for the burglary conviction. These sentences were ordered to be served consecutively.

¶2 Appeal to this court is mandatory and automatic when a trial court imposes a sentence of death. Ariz. R. Crim. P. 26.15 and 31.2(b). This court has jurisdiction under Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

## I.  BACKGROUND[1]

¶3 AnnMarie Merchant and Roscoe Merchant were sister and brother. Cindy Richards was Roscoe's girlfriend. Tucker had a relationship with AnnMarie for nearly a year before her death. He had known Roscoe for slightly longer. Tucker and AnnMarie had engaged in sexual intercourse at least twice. Tucker also had visited the apartment where the murders took place on a number of occasions.

¶4 AnnMarie often spoke on the telephone to family and

---

[1]  On appeal, the court views the facts presented in the trial below in a light most favorable to sustaining the verdict. *State v. Gallegos,* 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

friends.  She was in regular contact with her aunt, Hope Barnes, with whom she had a close relationship.  AnnMarie spoke almost daily with her cousin, Cassandra Barnes, Hope's daughter, with whom she also had a close relationship.

¶5       On the evening of July 15, 1999, after a number of telephone calls to the Merchant apartment went unanswered, Hope's husband called the police.  When police arrived at the apartment, they found AnnMarie's body face down with her hands behind her back.  Her mouth was covered by duct tape.  She was dressed in only a gray tee-shirt and bra.  A pair of jeans was found near her body.  Physical evidence obtained from AnnMarie's body included semen residue on her left inner thigh and on the front of her tee-shirt.  Testing of these semen samples resulted in a fourteen-point match with Tucker's DNA.[2]

¶6       Police found a single fingerprint belonging to Tucker at the crime scene.  It was located on the handle of the refrigerator door.

¶7       During a search of the Tucker home, the police recovered a roll of duct tape.  Tests on the roll of tape did not disclose any biological material linked to AnnMarie.  A side-by-side comparison of the tape found on AnnMarie's body and the tape found at the Tucker home indicated some similarities, but not a

---

[2]       Testimony indicated that only identical twins would share all fourteen points in the DNA test result.

conclusive match.

¶8      Ligature marks on AnnMarie's wrists indicated that she may have been handcuffed. Three pairs of handcuffs were recovered during the search of Tucker's home. The medical examiner did not compare the seized handcuffs to the marks on AnnMarie's wrists. All three pairs of handcuffs were tested for the presence of biological material, but none was found linking the handcuffs to AnnMarie. At trial, Tucker testified that he had the handcuffs because he was taking law enforcement classes in school.

¶9      AnnMarie's body had a ligature mark around the neck. The medical examiner testified it could have been made by a length of telephone cord found near the body. The medical examiner indicated that the ligature mark was made before AnnMarie's death.

¶10      AnnMarie was bludgeoned several times on the top and back of her head by a blunt instrument. A broken glass table top and the general disarray of the room indicated an intense struggle took place. The medical examiner believed that the weapon used to inflict the head wounds was cylindrical and one-quarter to one-half inch in diameter. A search of the crime scene, the surrounding area, and the Tucker home yielded no object matching those dimensions that contained any biological material that came from AnnMarie.

¶11      AnnMarie had bruising around her vagina and anus. The medical examiner testified that the extent of the bruising was not

a normal result of sex. She opined that the victim had been made to suffer based on the depth of the bruising.

¶12    AnnMarie suffered two gunshot wounds to the head. The shots were fired at close range. The medical examiner found that the cause of AnnMarie's death was two gunshot wounds, blunt force trauma, and strangulation. She indicated these were all contributing factors and could not isolate any one of them as the cause of death.

¶13    Roscoe's and Cindy's bodies were found in a separate bedroom lying in their bed. Each had a single gunshot wound to the head. Cindy also had a "through and through" gunshot wound to her thumb. The medical examiner could not determine whether Roscoe and Cindy were awake or asleep when they were shot. Cindy's seven-month-old son was found unharmed lying nearby in his crib.

¶14    The State's ballistics expert testified that the slugs recovered from all the victims were from .38 caliber bullets. The lands and grooves on one of the slugs indicated it most likely was fired from a Colt weapon. No gun was found at or near the crime scene matching that description. A search of Tucker's home turned up only a Smith & Wesson .357 caliber handgun.

¶15    The ballistics expert testified that the weapon found in Tucker's home was not the murder weapon. Police found a number of different types of .38 caliber bullets in the Tucker home. The State presented evidence that .38 caliber bullets can be fired from

a .357 gun. But because no shell casings were found at the crime scene, police could not make a comparison with the bullets found in Tucker's home. Furthermore, the type of bullet that killed all three victims was different from any of the types of bullets found in the Tucker home.

¶16     At trial, Tucker contended that the physical evidence found at the crime scene, his fingerprint and semen, could be explained by his prior visits to the apartment and prior sexual contact with AnnMarie. He testified that he had cooperated with the police by voluntarily agreeing to be interviewed and giving a blood sample. He attempted to counter the State's theory that he murdered the victims because of AnnMarie's rejection of his sexual advances by claiming the relationship had ended by mutual agreement and that he had another girlfriend at the time. However, Tucker did not know this girlfriend's last name or her telephone number, and he could not remember when they started seeing each other.

¶17     Tucker also raised an alibi defense. His mother claimed that he was home helping her with yard work at the time the murders took place. Mrs. Tucker testified that she had taken the day off from work specifically to do yard work and that Tucker was home with her all day. His father testified that Tucker was doing yard work with his mother when he arrived home from work in the afternoon on the day of the murders. Dennis Hall, a postal carrier, testified that he saw Mrs. Tucker and a young man who resembled Tucker doing yard work on the day of the murders.

-6-

¶18    The jury found Tucker guilty on all counts.  Following the verdict, the court held an aggravation and mitigation hearing. The State proved three aggravating factors: (1) Tucker knowingly created a grave risk of death to Cindy's baby by killing all of his care givers and leaving him alone in the house, A.R.S. § 13-703(F)(3) (2001); (2) the murder of AnnMarie was especially cruel, and all the murders were heinous and depraved, A.R.S. § 13-703(F)(6); and (3) Tucker had been convicted of other homicides that were committed during the commission of the offense, A.R.S. § 13-703(F)(8).  Tucker claimed his young age, A.R.S. § 13-703(G)(5), rehabilitation potential, good character, and lack of prior criminal history as mitigating factors.  *See* A.R.S. § 13-703(G). The court found Tucker's age and lack of criminal history to be mitigating factors, but rejected Tucker's claims of good character and rehabilitation potential as mitigating factors.  The court found the aggravating factors outweighed the mitigating factors and sentenced Tucker to death on all three first degree murder counts.

## II.  Discussion

### A.

¶19    Tucker claims that the trial court should have disqualified his trial counsel, Greg Clark, because of a conflict of interest.  He contends that Clark had an actual conflict of interest that prevented him from pursuing a third-party defense that would have implicated a former client of Clark.

¶20    Well before the trial, the State filed a motion to determine counsel. The motion alleged that Clark might have a conflict because he had represented Patrick Kozakiewicz, a potential witness in Tucker's case. Kozakiewicz and Tucker knew each other. During police interviews, Tucker indicated that Kozakiewicz knew, and did not like, Roscoe. The State's motion also stated that Kozakiewicz, during recorded jailhouse telephone conversations, told his family that he planned to testify against Tucker in this case. Additionally, Kozakiewicz told family members that Clark was going to arrange for a plea bargain in exchange for his testimony. Tucker claims that this evidence shows that Clark had a conflict of interest that prevented him from pursuing Kozakiewicz as a third-party defendant.

¶21    At a hearing on the matter, Clark stated that he had withdrawn from representation of Kozakiewicz immediately after the State filed its motion to determine counsel.[3] Clark had represented Kozakiewicz in two matters unrelated to this case: a probation violation and a charge that Kozakiewicz possessed contraband while he was in jail on the probation violation. Clark avowed that he had only two brief conversations with Kozakiewicz and that Tucker's name was never mentioned. He equivocated as to

---

[3]    Clark's Notice of Association in this case was filed on March 1, 2000. The State filed a Motion for Determination of Counsel on March 21, 2000. The next day Clark filed a Motion to Withdraw from his representation of Kozakiewicz, which he says was granted on March 23, 2000. Thus, Clark was counsel of record for both Tucker and Kozakiewicz for only three weeks, a little more than five months before Tucker's case came to trial on August 29, 2000.

whether he would pursue a third-party defense involving Kozakiewicz.

¶22 The trial court found no actual or potential conflict of interest. The court further found that the potential conflict was fully disclosed to Tucker and that in agreeing to keep Clark as his counsel, he waived any violation of his Sixth Amendment rights.[4] Tucker argues the trial court's refusal to disqualify Clark led to structural error requiring a new trial.

¶23 Generally, cases in which courts have found structural error involve a deprivation of counsel entirely, or denial of access to counsel at a critical stage in the trial process. *Mickens v. Taylor,* 535 U.S. 162, ___, 122 S. Ct. 1237, 1240-41 (2002) (citing cases). The Sixth Amendment violation claimed in this case does not rise to that level. Rather, Tucker's challenge is that the trial court improperly refused to disqualify defense

---

[4] The trial court based its finding of waiver on the following exchange:

> THE COURT: Mr. Tucker, you understand that the issue is the State is asking me to determine whether or not Mr. Clark will continue as your attorney in this case. Do you have a position you would like to tell they [sic] about whether you would like Mr. Clark to continue or not based upon a potential conflict with the witness Mr. Sakovitz [sic].
> THE DEFENDANT: No, sir, I don't.
> THE COURT: You are okay with Mr. Clark continuing then?
> THE DEFENDANT: Oh, yes.
> THE COURT: Do you want Mr. Clark to continue?
> THE DEFENDANT: Yes.

We do not address the issue of waiver in this case because at oral argument the State conceded that, on this record, the evidence that Tucker waived his Sixth Amendment rights is inadequate.

counsel. We review a trial court's decision on the disqualification of counsel for abuse of discretion. *State v. Jones,* 185 Ariz. 471, 482, 917 P.2d 200, 211 (1996) (citing *Okeani v. Superior Court,* 178 Ariz. 180, 181, 871 P.2d 727, 728 (App. 1993)).

**¶24** In *Jones,* this court examined whether the trial court wrongly refused to grant a withdrawal motion by defense counsel. The motion was filed because the State disclosed as a potential witness a former client of defense counsel for Jones. 185 Ariz. at 482, 917 P.2d at 211. The court found no error because neither party called the witness at trial. *Id.* Thus, no conflict of interest developed. *Id.* The court further held that if Jones was "arguing that defense counsel's decision not to call [the witness] to testify was ineffective assistance of counsel, he must do so in a proceeding for post-conviction relief."[5] *Id.*

**¶25** Because Kozakeiwicz was not called as a witness in this case, no conflict of interest actually arose. However, Tucker argues that Kozakeiwicz was not called as a witness because Clark chose not to investigate the possibility of naming Kozakeiwicz as a third-party defendant because of a conflict of interest. Tucker claims that despite Kozakeiwicz being an obvious third-party defendant, Clark avoided investigating the defense because the ethical rules prevented him from doing so.

---

[5] The witness might have corroborated Jones's self-defense claim as to one victim, and his claim that someone else killed the other victim. *Jones*, 185 Ariz. at 482, 917 P.2d at 211.

-10-

¶26     This argument presents two problems.  First, there is no record of why Clark did not pursue a third-party defense.  He may not have pursued the defense because of the potential ethical concerns of implicating a former client.  On the other hand, he may not have pursued such a defense because he and his client decided that the evidence would not have supported the defense.[6]  Why Clark did not pursue a third-party defense can only be developed at an evidentiary hearing in a post-conviction relief proceeding.  *See id.* at 482-83, 917 P.2d at 211-12 (citing *State v. Carver,* 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989)); *see also State v. Spreitz,* 202 Ariz. 1, 3, ¶ 9, 39 P.3d 525, 527 (2002) ("We reiterate that ineffective assistance of counsel claims are to be brought during Rule 32 proceedings.  Any such claims improvidently raised in a direct appeal, henceforth, will not be addressed by appellate courts regardless of merit.").  To that extent, *Jones* controls the resolution of this issue.

¶27     The second reason Tucker's argument fails on this record is that the evidence supporting a third-party defense is not so compelling that we can conclude, as a matter of law, that Clark's failure to pursue the defense demonstrates that he was laboring under an actual conflict of interest that had an adverse effect on

---

[6]     Before trial, the trial court ordered that fingerprints be retaken from Kozakeiwicz.  Apparently, the results of comparisons of his prints with latent prints from the crime scene were negative because the parties entered into a stipulation regarding identification of the latent prints found at the crime scene.

his performance.

**¶28** In Arizona, to have a viable third-party defense, the defendant must establish that the evidence of third-party responsibility is relevant and admissible under Arizona Rules of Evidence 401, 402, and 403. *State v. Gibson,* 202 Ariz. 321, 323-24, ¶¶ 15-16, 44 P.3d 1001, 1003-04 (2002). To be relevant, evidence must tend to prove or disprove a fact that is of consequence to the case. Ariz. R. Evid. 401. The fact of consequence is the identity of the killer of AnnMarie and Roscoe Merchant and Cindy Richards. Evidence that Kozakiewicz could have been the killer would be relevant to that issue. In *Gibson*, this court stated that for evidence related to a third-party defense to be relevant it "need only *tend* to create a reasonable doubt as to the defendant's guilt." 202 Ariz. at 324, ¶ 16, 44 P.3d at 1004.

**¶29** The evidence Tucker offers that Kozakiewicz might be the killer is the following: He knew all of the victims in this case; he did not like Roscoe; he did not like blacks;[7] he had spoken derogatorily of Roscoe and blacks in general; he had access to guns; he gave Tucker one of his three sets of handcuffs; and he had pled guilty to another murder that occurred two months before the murders in this case.

**¶30** Tucker cites *State v. Prion,* 203 Ariz. 157, 52 P.3d 189 (2002), as supporting the proposition that "evidence [that]

---

[7] Tucker is black and AnnMarie and Roscoe were bi-racial (black and white).

consisted of the defendant and another person being acquainted" was sufficiently relevant to meet the *Gibson* standard. We disagree for two reasons. First, Tucker misconstrues the holding in *Prion.* Second, the evidence in *Prion* was far more extensive than that presented in this case. *See* 203 Ariz. at 161, ¶ 23, 52 P.3d at 193.

¶31    *Prion* held that evidence that another person committed the crimes is admissible if it "supports the notion that [the third-party] had the *opportunity and motive* to commit this crime." *Id.* at 161, ¶ 24, 52 P.3d at 193 (emphasis added). The evidence in *Prion* consisted in part of the following: The third-party defendant was a co-worker of the victim at a restaurant; on the day the victim disappeared he had rented a new apartment that was close to both a night club where he also worked and the location at which the victim's car was found after her disappearance; he was working at the night club the night the victim disappeared; and the doorman at the night club said the victim was let into the club on the night she disappeared specifically to see the third-party defendant. *Id.* at 161, ¶ 23, 52 P.3d at 193.

¶32    The evidence Tucker offers only minimally indicates that Kozakiewicz had motive, albeit the same motive as perhaps dozens of other people who were acquainted with the Merchant family. But, unlike in *Prion*, Tucker does not point to any evidence showing that Kozakiewicz had the opportunity to kill the Merchants. Without some evidence tending to connect Kozakiewicz to the crime scene,

Tucker's speculation that Kozakiewicz might have been the killer is arguably irrelevant, and therefore would likely have been found inadmissible.

¶33 Accordingly, Tucker's claim that his right to the assistance of conflict-free counsel, *see Von Moltke v. Gillies,* 332 U.S. 708, 725 (1948), was violated is not supported by this record. He has not shown that Clark labored under an actual conflict of interest, and he has not shown that Clark's decision not to pursue a third-party defense was motivated by concerns of violating the ethical rules. Thus, any claim that Clark was ineffective in not calling Kozakiewicz to testify or investigating him in the first instance must be presented in a petition for post-conviction relief. *Spreitz,* 202 Ariz. at 3, ¶ 9, 39 P.3d at 527. The trial court therefore did not abuse its discretion in denying the State's motion to determine counsel.

¶34 Tucker next argues that even if the conflict of interest did not rise to the level of a Sixth Amendment violation, this court should remand for a new trial because of the appearance of impropriety. *See Gomez v. Superior Court,* 149 Ariz. 223, 225-26, 717 P.2d 902, 904-05 (1986).

¶35 In *Gomez*, we held that while the appearance of impropriety was no longer a standard in the Arizona Rules of Professional Conduct, it still remains a valid claim for purposes of disqualification of an attorney. *Id.* We listed four factors for consideration when disqualification of an attorney is sought on

-14-

the basis of the appearance of impropriety:

> (1) whether the motion is being made for the purpose[] of harassing the defendant, (2) whether the party bringing the motion will be damaged in some way if the motion is not granted, (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances, and (4) whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation.

*Id.* at 226, 717 P.2d at 905 (citing *Alexander v. Superior Court*, 141 Ariz. 157, 165, 685 P.2d 1309, 1317 (1984).

¶36 Tucker's only argument here focuses on the fourth factor. He contends that Clark's decision to forgo a third-party defense because it would implicate a former client engenders "public mockery of our criminal justice system, especially when it comes to lawyers representing capital clients." This argument presupposes that Tucker had a viable third-party defense. But as discussed above, the record does not support that presupposition. Thus, this argument fails.

¶37 Finally, Tucker argues that the doctrine of judicial estoppel should prohibit the State from taking a position on appeal that is contrary to the position it asserted at trial. This court has held that to establish a claim for the application of judicial estoppel, "(1) the parties must be the same, (2) the question involved must be the same, and (3) the party asserting the inconsistent position must have been successful in the prior judicial proceeding." *State v. Towery,* 186 Ariz. 168, 182, 920 P.2d 290, 304 (1996) (citation omitted). Tucker fails to note that

-15-

while the parties and the issue are the same, the State was not successful in asserting its position in the trial court. The State asserted that Clark's conflict of interest in this case was so serious that it could not be waived and thus Clark could not serve as Tucker's counsel. The State's motion was denied. As such, the State is not estopped from asserting its position on appeal.

**B.**

¶38    Tucker argues that the trial court erred in admitting testimony from Cassandra Barnes (Cassie) regarding a telephone conversation she had with AnnMarie on July 13, 1999. Specifically, Tucker objects to the admission of Cassie's testimony that AnnMarie told her in that conversation that Tucker was upset with her and verbally abusive toward her.[8]   Cassie testified that AnnMarie called her that evening and sounded as though she was upset and crying.   AnnMarie told her that she had "just got[ten] off the phone" with Tucker, that he had asked her to come to his house, and when she had refused, he got upset and called her names.

¶39    After a hearing on this issue, the court admitted Cassie's testimony about AnnMarie's statements from not only the July 13th conversation, but also two other statements from a July 14th conversation.   The court relied upon three different exceptions to the rule against hearsay: present sense impression, Ariz. R. Evid. 803(1); excited utterance, Ariz. R. Evid. 803(2); and state of mind, Ariz. R. Evid. 803(3).

---

[8]    Tucker admittedly called AnnMarie "worthless" and a "fat-ass."

¶40 The July 14 conversation included a statement by AnnMarie that Tucker was upset with her, as well as a statement that she wanted nothing more to do with Tucker.[9] Tucker does not contest the admission of the two statements from the July 14 conversation. Rather, Tucker contends that the court erred in admitting the statements from the July 13 conversation that he was upset with AnnMarie and had called her names. He claims that it was error to admit the statements under any exception to the rule against hearsay.

¶41 The Arizona Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ariz. R. Evid. 801(c). To be admissible, a court must find that the out-of-court statement fits within one of the many exceptions to the rule against hearsay. *State v. Bass,* 198 Ariz. 571, 577, ¶ 20, 12 P.3d 796, 802 (2000). We review admissions of evidence under exceptions to the rule against hearsay for abuse of discretion. *State v. Robinson,* 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990); *State v. Adamson,* 136 Ariz. 250, 255, 665

---

[9] During the July 14 conversation, while Cassie was talking to AnnMarie, AnnMarie received a call on the other line. She used call waiting to take the other call while Cassie waited on the other line. When AnnMarie returned to the line to talk to Cassie, she said that Tucker had been the caller on the other line and that he had been upset with her and that she wanted nothing more to do with him. The court admitted AnnMarie's statements that Tucker was upset with her under the present sense impression and excited utterance exceptions to the rule against hearsay. *See* Ariz. R. Evid. 803(1) & (2). The court admitted AnnMarie's statement that she wanted nothing more to do with Tucker as a statement of her then existing state of mind. *See* Ariz. R. Evid. 803(3).

P.2d 972, 977 (1983)(citation omitted). We conclude that the trial court did not abuse its discretion in admitting the statement under Rule 803(1). Thus, we find it unnecessary to decide whether the statement was admissible under Rule 803(2) or 803(3).

¶42      Rule 803(1), Ariz. R. Evid., defines a present sense impression as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." The theory behind this exception "is that substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation." Joseph M. Livermore et al., *Arizona Practice: Law of Evidence* 346 (4th ed. 2000)(citation omitted); *see also* 5 *Weinstein's Federal Evidence* § 803.03[1] (2d ed. 2002) (noting that present sense impressions are "highly trustworthy because: 1. the statement is simultaneous with the event, thus, there is no memory problem; 2. there is little or no time for calculated misstatement; and 3. the statement is usually made to one who has equal opportunity to observe and check misstatements"). Statements of present sense impressions are deemed reliable because they are made close in time to the events they describe. *See* Livermore et al., *supra,* at 346. The more time that elapses between the event and the statement, the stronger the possibility that a declarant will attempt, either consciously or subconsciously, to alter his or her description of the event. *See id.* We assume, as a general matter, that when the declarant has had little time to reflect on the event

she has perceived, her statement will be spontaneous and therefore reliable. *See id.*

¶43    The present sense impression exception has three requirements. *State v. Romanosky,* 162 Ariz. 217, 222 n.5, 782 P.2d 693, 698 n.5 (1989). The statement must describe an event or condition, that was perceived by the declarant, and the statement must be made immediately after the event. *Id.*

¶44    There is no dispute that AnnMarie's statements to Cassie describe an event that AnnMarie perceived. The issue here is the lapse of time between the perception and the statement. Specifically, Tucker argues that AnnMarie did not make her statement to Cassie "immediately" after she perceived Tucker's statement, as is required by Rule 803(1). While Cassie testified that, in the July 13 conversation, AnnMarie said, "she had just hung up" with Tucker, Cassie admitted she did not know exactly when Tucker and AnnMarie spoke that day.

¶45    The phrase "just hung up" could have a variety of meanings. To some it might denote a lapse of mere seconds, and to others the passage of a longer time. Rule 803(1) requires some degree of contemporaneity between the event and the statement. How much contemporaneity has never been specified because every case is decided on its individual facts. *See* Livermore et al., *supra,* at 346 (citing cases). The admissibility of such statements must be judged on the totality of the circumstances. *State v. Barnes,* 124 Ariz. 586, 589-90, 606 P.2d 802, 805-06 (1980).

¶46    That Cassie could not say that AnnMarie's statements were made "immediately" after her conversation with Tucker does not necessarily make the statements inadmissible. Trial courts have some latitude in finding whether a statement was made immediately after the event. *See, e.g., United States v. Parker,* 936 F.2d 950, 954 (7th Cir. 1991) (holding railroad worker's statement to police, made after he had walked approximately 100 feet, admissible as a present sense impression); *United States v. Blakey,* 607 F.2d 779, 786 (7th Cir. 1979) (holding statement made twenty-three minutes after event admissible as a present sense impression), *overruled on other grounds, Idaho v. Wright,* 497 U.S. 805 (1990). We agree with Tucker that the dictionary definitions of the terms "just" and "immediate" differ slightly. However, while "just hung up" may denote a variety of time frames, the phrase normally denotes a short period of time.

¶47    The trial court observed Cassie while she testified during the hearing. Thus, it was in a better position than are we to find that Cassie would have understood what AnnMarie meant by "just hung up." Accordingly, we cannot say the trial court abused its discretion in determining that, in this instance, "just hung up" implied the sort of contemporaneity required by Arizona Rule of Evidence 803(1).

## C.

¶48    Tucker contends that the United States Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466 (2000), overruled

the holding in *Schad v. Arizona,* 501 U.S. 624 (1991). *Schad* held that jury unanimity is not required on which theory of first degree murder the jury convicted. *Id.* @ 645.

¶49     The State offered alternative theories on which the jury could have found Tucker guilty of the first degree murder of AnnMarie. The jury could have found either that Tucker had committed first degree murder by premeditation, or that he had committed felony murder. Because there were alternative theories, the court gave the jury a verdict form that required them to record how many jurors voted for each alternative. All twelve members of the jury found Tucker guilty of premeditated murder. However, only eleven jurors voted in favor of felony murder. Tucker argues that because the jury was not unanimous on the felony murder theory, his sentence as to that murder count must be vacated.

¶50     There is only a single crime of first degree murder. *State v. Arnett,* 158 Ariz. 15, 19, 760 P.2d 1064, 1068 (1988). Felony murder is not a separate offense, *id.*, as Tucker appears to argue. That felony murder and premeditated murder contain different elements does not make them different crimes, rather they are simply two forms of first degree murder. *Id.*

¶51     Tucker's argument that *Apprendi* overrules the holding in *Schad* is meritless. *Schad* held that jurors need not be unanimous as to a single theory of murder so long as they all agree that first degree murder was committed, whether by premeditation or felony murder. 501 U.S. at 645. Here the jury unanimously found

Tucker guilty of premeditated murder. Thus, it is a moot point that only eleven jurors also found Tucker guilty of first degree murder by way of felony murder. Even if *Apprendi* did have some effect on the holding in *Schad*, it is of no consequence here because Tucker was unanimously found guilty of first degree murder on a theory of premeditation.

## D.

¶52 Tucker raises a number of sentencing issues in this case. We address only one of them because we conclude that based on our determination of that issue Tucker must be resentenced. Because Tucker will be resentenced, all other sentencing issues he raises are moot.

¶53 Tucker argues that he was deprived of his Sixth Amendment right to a jury trial on the question of his capital sentence. In *Ring v. Arizona,* 536 U.S. 584, 609 (2002) (*Ring II),* the United States Supreme Court held that Arizona's capital sentencing scheme violated the right to a jury trial guaranteed by the Sixth Amendment to the United States Constitution. The Court declared that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. The Court reversed our decision in *State v. Ring,* 200 Ariz. 267, 25 P.3d 1139 (2001) (*Ring I*), and remanded for further proceedings consistent with its decision. *Ring II,* 536 U.S. at 609.

-22-

¶54    Following the Supreme Court's *Ring II* decision, we consolidated all death penalty cases in which this court had not yet issued a direct appeal mandate, including Tucker's, to determine whether *Ring II* required this court to reverse or vacate the defendants' death sentences. In *State v. Ring,* ___ Ariz. ___, ___, ¶ 53, 65 P.3d 915, 936 (2003) (*Ring III*), we concluded that we will examine a death sentence imposed under Arizona's superseded capital sentencing statute for harmless error. *See* A.R.S. § 13-703, *amended by* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.

¶55    In Tucker's case, the trial court found three aggravating factors: (1) "In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense," A.R.S. § 13-703(F)(3); (2) "The defendant committed the offense in an especially heinous, cruel or depraved manner," A.R.S. § 13-703(F)(6); and (3) "The defendant has been convicted of one or more other homicides, as defined in § 13-1101, which were committed during the commission of the offense," A.R.S. § 13-703(F)(8). Based on our decision in *Ring III,* none of the aggravating factors found in Tucker's case fall outside the *Ring II* mandate. *See Ring III,* ___ Ariz. at ___, ¶¶ 54-86, 65 P.3d at 936-42. Therefore, we must analyze each of Tucker's aggravating factors for harmless error. To determine whether allowing the trial judge, rather than a jury, to find the presence of the aggravating factors was harmless error we must find, beyond a

-23-

reasonable doubt, that no reasonable jury could have come to a different conclusion than the trial judge. *See State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993) (discussing harmless error).

¶56    The trial court based its finding of the (F)(3) aggravator on the fact that Tucker had killed all the members of the Merchant household and left Cindy's infant son alone in his crib with no means of caring for himself.  The court found that because the crib was near the head of the bed in which Roscoe and Cindy were killed, Tucker must have known of the infant's presence and should have known that leaving the infant alone in the house created a grave risk of death to the child.  We conclude the error here was not harmless.

¶57    The statute requires the fact finder to determine that the defendant "knowingly created a grave risk of death."  A.R.S. § 13-703(F)(3).  While we believe a reasonable jury could have inferred that Tucker knew the child was in the room, we cannot say that any reasonable jury would also have found that Tucker knowingly placed the baby in danger of death, or indeed that he knew that leaving the child alone created a grave risk of death.

¶58    In past cases involving this aggravator, this court has found a defendant created a grave risk of death to bystanders by firing a gun indiscriminately or setting fire to a building the defendant knew was occupied.  *See, e.g., State v. Vickers,* 159 Ariz. 532, 546, 768 P.2d 1177, 1191 (1989) (setting fire to an

inmate in his cell, thus endangering nearby inmates trapped in their cells); *State v. McMurtrey,* 151 Ariz. 105, 108, 726 P.2d 202, 205 (1986) (shooting victims in a crowded bar); *State v. Ortiz,* 131 Ariz. 195, 209, 639 P.2d 1020, 1034 (1982) (setting fire to the victim's house while her children were inside); *State v. Doss,* 116 Ariz. 156, 163, 568 P.2d 1054, 1061 (1977) (shooting a victim in a crowded gymnasium). Generally, our decisions have held that a third party must be in the zone of danger *during* the murderous attack to be placed at grave risk of death. *State v. Wood,* 180 Ariz. 53, 69, 881 P.2d 1158, 1174 (1994). Here, the infant's life was placed in danger as a result of Tucker's crimes, but there was no evidence introduced that the infant was in any danger during the attacks.

¶59    The State's theory of grave danger in this case appears to be based on the fact that an infant left alone creates a risk the infant will die of dehydration or perhaps heat stroke.[10]  For Tucker's actions to have been knowing, there would have to be some evidence that Tucker knew the child would be left alone for a very long time.  We find nothing in the record to support that conclusion.  Thus, we cannot conclude beyond a reasonable doubt that any reasonable jury would have found either that Tucker knowingly placed the infant at grave risk of death, or alternatively, that the risk of death to the child was present

---

[10]    There was also some mention of the fact that the door to the apartment was left open.  While theoretically this placed the life of the child at risk we find it difficult to say that created a grave risk of death.

-25-

during Tucker's murderous attacks on the other three victims.

¶60    The (F)(6) aggravator was found with respect to each of the victims.  As to AnnMarie, the court found her murder was especially cruel.  Because the (F)(6) aggravator is phrased "in the disjunctive, a finding of either cruelty or heinouness/depravity will suffice to establish this factor." *State v. Djerf*, 191 Ariz. 583, 595, ¶ 44, 959 P.2d 1274, 1286 (1998).  "A murder is especially cruel if the victim consciously suffers physical or mental anguish."  *Id.* at 595, ¶ 45, 959 P.2d at 1286 (citation omitted).  And such suffering must be reasonably foreseeable. *Id.*

¶61    The evidence in this case showed that AnnMarie was raped, beaten, strangled, and then shot.  The police testified that the disarray of the room and the various locations of blood spatter patterns and blood pools indicated there was a prolonged struggle in the room.  While the medical examiner could not be certain about AnnMarie's state of consciousness during the attack, that she had been handcuffed at some point during her ordeal indicates she was conscious for at least some period as there would be little point in subduing an unconscious victim.  The extent of AnnMarie's injuries indicates that she suffered physically.  And the circumstances of her murder clearly demonstrate that it was reasonably foreseeable she would suffer.  Accordingly, we conclude that no reasonable jury could have found the murder of AnnMarie was anything but especially cruel.

¶62    The trial court also found the murder of AnnMarie was

heinous and depraved. Because we have found harmless the *Ring II* error that the murder of AnnMarie was especially cruel, it is unnecessary for us to reach the question of whether her murder was also heinous and depraved. *Id.* at 595, ¶ 44, 959 P.2d at 1286.

¶63 The trial court found the murders of Roscoe and Cindy were heinous and depraved because of the helplessness of the victims. The trial court theorized that they were killed for the purpose of witness elimination. In *Djerf,* we stated there are five factors that may indicate a murder was heinous or depraved. 191 Ariz. at 597, ¶ 53, 959 P.2d at 1288. The factors include: "(1) relishing the murder, (2) inflicting gratuitous violence, (3) victim mutilation, (4) senselessness of the crime, and (5) helplessness of the victim." *Id.* (citations omitted)*.* In *State v. King,* 180 Ariz. 268, 285, 883 P.2d 1024, 1041 (1994), we held that the (F)(6) aggravator cannot be sustained solely on the basis that a defendant killed to eliminate witnesses. We concluded that witness elimination could be a factor in finding that a murder was heinous and depraved, but it could not be the only factor. *Id.*

¶64 The purpose of aggravating factors is to distinguish murders that are beyond the norm of first degree killings. *See id.* at 287, 883 P.2d at 1043. While any murder is tragic and senseless in its own way, it is debatable whether the execution style murder of two sleeping victims is heinous and depraved. Thus, we cannot find beyond a reasonable doubt that no jury could have found the murders of Roscoe and Cindy were anything but heinous and depraved.

¶65     Finally, the trial court found the (F)(8) aggravator in this case because Tucker committed multiple homicides in connection with his crimes.   As we said in *Ring III,* this aggravator is subject to harmless error analysis. ___ Ariz. at ___, ¶¶ 80-82, 65 P.3d at 941-42.   But it is not enough that the jury found the defendant guilty of multiple homicides.   The (F)(8) aggravating factor is only properly applicable when there is evidence that all the killings took place during "a continuous course of criminal conduct." *State v. Rogovich,* 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997).   The fact-finder must determine that there was a "temporal, spatial, and motivational relationship[] between the capital homicide and the collateral [homicide]." *Id.* (quoting *State v. Lavers,* 168 Ariz. 376, 393, 814 P.2d 333, 350 (1991)).

¶66     The murders in this case all occurred in the same apartment, which clearly indicates a spatial relationship.   The State theorized Roscoe and Cindy were killed to eliminate them as possible witnesses.   While a jury may have found Tucker's motivation was something different, it is difficult to imagine a motive for the killings unrelated to the murder of AnnMarie.  Based on the evidence offered at trial, any error as to the (F)(8) aggravator was harmless because we believe that no reasonable jury could have found differently than the trial judge.

¶67     Our inquiry must also consider whether reversible error occurred with respect to the mitigating circumstances.  *Ring III*, ___ Ariz. at ___, ¶ 89, ___, ¶ 104, 65 P.3d at 943, 946.   As

-28-

discussed earlier, Tucker presented as mitigating factors his age, rehabilitation potential, good character, and lack of prior criminal history. The trial court found Tucker's age and lack of prior criminal history to be mitigating factors. But on this record, we cannot conclude that a reasonable jury would not also have found as mitigating factors Tucker's good character and rehabilitation potential. Tucker presented evidence on these factors through testimony from his mother. While the trial court implicitly found the witness unbelievable, a jury could reach an opposite conclusion. Thus, we cannot say that if a jury heard the same evidence as the trial judge, it would reach the same conclusions with respect to the mitigating factors.

¶68        In sum, while the error as to some of the aggravating factors found by the trial court was harmless, we cannot say beyond a reasonable doubt that a jury, presented with the same evidence, would have found that the (F)(3) aggravator or the (F)(6) aggravator as to Roscoe and Cindy had been proven beyond a reasonable doubt. Nor on this record can we say that a jury would have assessed the mitigating evidence as did the trial judge. Therefore, we must remand this case for resentencing under A.R.S. sections 13-703 and -703.01 (Supp. 2002).

### III.  CONCLUSION

¶69        For the foregoing reasons, we affirm Tucker's convictions on the three counts of first degree murder and his convictions and sentences on the non-capital offenses. We remand

Tucker's death sentences for resentencing.

_____

                    Michael D. Ryan, Justice

CONCURRING:


_____

Ruth V. McGregor, Vice Chief Justice


_____

Rebecca White Berch, Justice


_____

Robert J. Corcoran, Justice (Retired)*

Jones, C.J., concurring in part, dissenting in part:

**¶70**      I concur in all aspects of today's opinion pertaining to
Tucker's convictions and sentences with the sole exception that I
dissent from the majority's use of harmless error analysis of
capital sentencing determinations made by the trial judge in the
absence of the jury.  In the aftermath of the Supreme Court's
decision in _Ring v. Arizona_, 536 U.S. 584, 122 S. Ct. 2428 (2002)
(_Ring II_), it is my view that the absence of the jury in the
sentencing phase of a capital trial amounts to structural error.
The right to jury trial is fundamental.  Where a judge, not a jury
determines sentencing issues, a violation of the Sixth Amendment of
the Constitution of the United States, requiring trial by an

impartial jury, has occurred. I would remand the case for resentencing, simply on the basis of the Sixth Amendment violation. *See State v. Ring*, ___ Ariz. ___, ___, ¶¶ 105-14, 65 P.3d 915, 946-48 (2003) (Feldman, J., concurring in part, dissenting in part) (*Ring III*).

_____

Charles E. Jones, Chief Justice

* Due to a vacancy on the court, Retired Justice Corcoran was designated to sit on this case pursuant to Article 6, Section 3, of the Arizona Constitution.