NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

MAURICE TYRONE HOLMES, JR., *Appellant*.

No. 1 CA-CR 14-0443
FILED 9-24-2015

Appeal from the Superior Court in Coconino County
No. S0300CR201200914
The Honorable Jacqueline Hatch, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Myles A. Braccio
*Counsel for Appellee*

Coconino County Public Defender's Office, Flagstaff
By Brad Bransky
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Michael J. Brown and Judge Kent E. Cattani joined.

**H O W E**, Judge:

¶1        Maurice Tyrone Holmes, Jr. appeals his conviction and sentence for manslaughter. Holmes argues that the trial court erred in admitting statements the victim made shortly before her death, in excluding other statements the victim made, and in limiting his expert witness's testimony. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Holmes and the victim were in a romantic relationship. One day, the victim and her friend agreed to meet at a library. The victim was with Holmes at his mother's house and whispered to her friend over the phone that she wanted "a little bit of . . . breathing room" because Holmes was "overbearing" and "controlling" and "he didn't want her to have a life outside of him." The victim never showed up.

¶3        Holmes' mother's neighbor was in her yard that day when she heard Holmes screaming, "Help, help. She's been shot." When they were inside Holmes' mother's house, Holmes led the neighbor to a bedroom, where she saw the victim on the floor with "a massive amount of blood on the right side of her chest that ran down her side." The victim was not breathing.

¶4        Holmes called the police and handed the neighbor his phone. Following the operator's orders, the neighbor got Holmes out of the house, and within moments the police arrived. The police cleared the house and found the victim with blood on the side of her face and on her chest. When the paramedics tried to help her, she had already died. The victim had suffered a gunshot wound, with the bullet entering her neck under her right ear, traveling through several arteries, and exiting the other side of her neck. An autopsy of the victim later found methamphetamine and other drugs in her bloodstream.

¶5        In the house, the police found a bloodstained gun on a small table. An officer asked Holmes whether he knew of the gun, and Holmes said that he found it next to the victim and that he moved it to the table.

¶6        When one officer asked what happened, Holmes said that he was taking a shower while the victim was arguing with her cousin. He then heard a boom, ran out of the shower, and saw that the victim was hurt. While talking with Holmes, the officer noticed that "he had a distinct body odor of someone who had not bathed in a couple of days and he was dry,

including his hair." The officer also noticed that Holmes' palms were bloody, which meant he would leave red stains on whatever he touched.

¶7 When another officer asked what happened, Holmes' explanation changed slightly. This time he said that he heard the victim "talking" with "someone" and then he heard a shot. He added that when he came out of the shower, he saw the victim slumped over a chair and the gun near her right hand. He also added that he moved her to the floor and the gun to the table.

¶8 The police inspected the house and found no evidence that Holmes had taken a shower. Meanwhile, other officers located and investigated the victim's cousin and confirmed that he was at work all day. Holmes was taken to a hospital because he was in shock. There, the police interviewed him, and the detective reviewed the same scenario several times with Holmes and noted that the details continued to change. The detective consequently asked Holmes whether he would continue the interview at the police station; Holmes agreed.

¶9 At the station, Holmes explained that while he was in the shower, he heard the victim on the phone arguing with a man. He continued to shower and then heard a loud bang, but did not think anything of it. After he finished showering, he needed his toothbrush and toothpaste and yelled to the victim to bring them. Because she did not respond, he went to look for her. He found her sitting on a chair, with blood on the left side of the chair and the gun next to her right hand. On his way out of the house to get help, he picked up the gun and put it on a table. He explained that he got blood on himself because he was following the police operator's direction to check the victim's pulse.

¶10 The detective reviewed the chronology of events with Holmes, and Holmes repeatedly changed his story by adding details about why the victim's cousin would kill her. After the interview, the detective arrested Holmes, and the State charged him with second degree murder.

¶11 The trial court held several evidentiary hearings to address the admissibility of various statements made by the victim. The State had moved to admit the victim's statements that she had made to her friend the day she died, including that Holmes was "overbearing" and "controlling" and that she wanted "breathing room," but Holmes objected. Because Holmes' defense was suicide or accident, however, the court admitted the statements as evidence of Holmes' motive and the victim's state of mind and her present-sense impression before death.

¶12        Holmes sought to admit the victim's various statements about being depressed and suicidal in the months leading to her death, but the State objected. Holmes' grandmother testified that Holmes once showed her a text message he received in which the victim said that if they did not get back together, she did not have anything to live for. But his grandmother could not remember if she personally saw the text or whether the victim had sent it and gave varying versions of what it said during her testimony. The court precluded the testimony because it was not relevant to any material fact, it was inadmissible hearsay, and its prejudicial value outweighed any probative value.

¶13        Holmes' mother testified that after Child Protective Services ("CPS") took the victim's children, the victim spoke to her about various issues, including being unhappy and not understanding why CPS took her children. His mother could only describe the circumstances of the statements, however, and admitted that the victim never told her that she was suicidal and never made any statements making his mother think that she was suicidal. The court precluded the testimony because Holmes could not establish foundation for the statements, Arizona Rule of Evidence 803(3) did not "allow a description of the factual occurrence that engendered the victim's state of mind," and the statements' prejudicial value outweighed any probative value.

¶14        Holmes' mother also testified that the victim gave her a sealed letter several days before her death. His mother put the letter in her car, found it two months later, and gave it to Holmes' attorney. The letter was simply addressed to "Baby" and signed by "Me." The court precluded the letter because Holmes could not establish foundation for it and it was inadmissible hearsay.

¶15        Holmes' sister testified that during the months before the victim's death, the victim talked to her about being unhappy and powerless. The court precluded his sister from testifying to any statements the victim made to her because Holmes could not establish foundation, the statements were not relevant to any material fact, and they had no probative value. The court found that Holmes' sister could not testify to what the specific statements were or when the victim made the statements.

¶16        The victim's acquaintance testified that the victim texted her: "My mom took my children and I just want to kill myself." The court precluded the text message because Holmes could not establish foundation, it was inadmissible hearsay, and its prejudicial value outweighed any probative value. The court found that the women's relationship was only

"casual and involved the exchange of pain pill[s]" and any statements the victim made could have been "to gain sympathy and acquire pills rather than be a statement of the victim's real intent to kill herself."

¶17          At trial, Holmes argued that he was trying to stop the victim's suicide attempt and the gun fired as they struggled over it. Holmes sought to introduce expert testimony that methamphetamine in a person's system amplifies the person's emotions and makes her more likely to have suicidal ideations. Holmes contended that the testimony was relevant to educate the jurors on how methamphetamine abuse related to suicide and to help them evaluate his suicide defense. After a voir dire examination of the expert, the trial court limited his testimony. Because the proffered testimony was about long-term drug abusers, and Holmes presented no evidence that the victim was such an abuser, the court found that the testimony was irrelevant, that it would mislead and confuse the jury, and that it was highly prejudicial.

¶18          The jury found Holmes guilty of the lesser-included offense of manslaughter. The trial court sentenced him to 15.5 years' imprisonment with 557 days of presentence incarceration credit. Holmes timely appeals.

## DISCUSSION

### 1. Admission of the Victim's Statements

¶19          Holmes first argues that the trial court erred in admitting the victim's statements to her friend the day she died because the statements were hearsay and not admissible under any of the exceptions. We review the admission of evidence pursuant to an exception to the hearsay rule for an abuse of discretion. *State v. Tucker*, 205 Ariz. 157, 165 ¶ 41, 68 P.3d 110, 118 (2003). Abuse of discretion is "an exercise of discretion which is manifestly unreasonable, exercised on untenable grounds or for untenable reasons." *State v. Woody*, 173 Ariz. 561, 563, 845 P.2d 487, 489 (App. 1992). The trial court did not abuse its discretion in admitting the statements as evidence of the victim's state of mind under Arizona Rule of Evidence 803(3).

¶20          A victim's state of mind is relevant to show the defendant's motive, *State v. Fulminante*, 193 Ariz. 485, 496 ¶ 34, 975 P.2d 75, 86 (1999), or when a defendant raises the defense of accident or suicide, *State v. Christensen*, 129 Ariz. 32, 36, 628 P.2d 580, 584 (1981). Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered to prove the truth of the matter asserted. Ariz. R. Evid. 801(c). Hearsay is generally inadmissible, however, unless it satisfies an exception to the hearsay rule. Ariz. R. Evid. 802. One exception permits the admission

of "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)[.]" Ariz. R. Evid. 803(3).

**¶21**        Here, the trial court did not err in admitting the statements as evidence of the victim's state of mind. Holmes made the victim's state of mind relevant when he pursued the defense of suicide or accident in the course of attempting to stop a suicide. Holmes made it clear throughout the pretrial proceedings and trial that to support his defense, he would submit evidence that at the time of her death, the victim felt she had nothing to live for because CPS took her children, she lost her home, and Holmes wanted to end their relationship. The victim's statements to her friend were relevant to rebut this defense.

**¶22**        Further, the statements were relevant to show that when the victim made them, she did not intend to commit suicide that day and was not so enamored with Holmes that she felt she would rather die than live without him. Consequently, the statements were relevant to show the victim's state of mind in light of Holmes' suicide defense, and the court did not err in admitting them. Because we find that the court did not err in admitting the statements under the state-of-mind exception, we need not address whether it erred in admitting the evidence as a present-sense impression. *See Tucker*, 205 Ariz. at 165 ¶ 41, 68 P.3d at 118.

## 2. Exclusion of the Victim's Statements

**¶23**        Holmes next argues that the trial court erred in excluding the victim's statements to his grandmother, mother, sister, and her acquaintance and a letter she wrote. We review evidentiary rulings for an abuse of discretion. *State v. Smith*, 215 Ariz. 221, 232 ¶ 48, 159 P.3d 531, 542 (2007). The trial court did not abuse its discretion in excluding any of the proffered statements.

### 2a. Grandmother and the Text Message

**¶24**        Holmes argues that the trial court erred in excluding his grandmother's testimony about a text message Holmes showed her from the victim. But the trial court did not err because the testimony was not relevant to any material fact. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Ariz. R. Evid. 401. As an initial matter, the record shows that Holmes' grandmother could not remember the text's wording and could only testify to its "effect." His grandmother believed that the victim sent the text only because Holmes

told her it was from the victim. Even if the text was from the victim and the general "effect" was as his grandmother testified, the text showed only that the victim was upset two to three weeks before her death and did not show any intent or plan. The record also shows that the victim and Holmes were ultimately back together at least two days before the victim's death. Consequently, the trial court properly excluded Holmes' grandmother's testimony about the text message.

## 2b. Statements to Holmes' Mother

¶25        Holmes next argues that the trial court erred in excluding the victim's statements to his mother about being unhappy. But the trial court did not err because Holmes did not establish foundation for the testimony. To authenticate an evidentiary item, the "proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ariz. R. Evid. 901(a). Holmes' mother described only the factual circumstances engendering the victim's state of mind, not the statement itself. Given the nature of Holmes' mother's testimony, Holmes offered no other evidence to support his claim that the victim actually made any statements to his mother about being unhappy. Further, Holmes' mother admitted that she heard nothing from the victim suggesting that she was suicidal. Thus, the trial court properly excluded Holmes' mother's testimony about the victim's statements.

## 2c. Statements to Holmes' Sister

¶26        Holmes contends that the trial court erred in excluding statements the victim made to his sister. Holmes' entire substantive argument on this issue consists of the single sentence: "Appellant takes issue with the court's ruling that [his sister] 'could not recall a specific statement that was made by the victim' and the statement was irrelevant 'to any material issue in this case.'" However, merely mentioning an argument is not enough. *State v. Moody*, 208 Ariz. 424, 452 ¶ 9, 94 P.3d 1119, 1147 (2004). "[O]pening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised." *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989). Holmes has waived and abandoned this issue because he has failed to sufficiently argue and support it on appeal. *See id.*; *State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995). Regardless of the waiver, although Holmes' sister initially testified about several statements the victim allegedly made, she admitted that she did not remember any of the victim's specific statements nor when the victim made any statements to her. This lack of foundation for the

victim's statements alone was sufficient to permit the trial court to exclude his sister's testimony about the statements. *See* Ariz. R. Evid. 901(a).

### 2d. Text Message to her Acquaintance

**¶27** Holmes next contends that the trial court erred in excluding a text message in which the victim told an acquaintance, "I'm just going to kill myself." But the trial court did not err because Holmes did not establish foundation for the statement. The acquaintance testified that she was not the victim's friend, did not know her very well, and did not even know the victim's real name. She and the victim, however, both used illegal drugs. Even the acquaintance admitted that the text was "bizarre" given that she and the victim were not friends, did not socialize with each other, and "rarely" discussed children. Consequently, the trial court did not err in excluding the text message the victim sent her acquaintance.

### 2e. The Letter

**¶28** Holmes further asserts that the trial court erred in excluding a letter the victim wrote to Holmes. But the trial court did not err because Holmes did not establish foundation for the letter. Although his mother testified that the victim gave her the letter, nothing in the record supports his mother's claim that the victim did so. More importantly, nothing in the record shows that the letter was actually written by the victim. The letter was simply addressed to "Baby" and signed by "Me." Holmes proffered no evidence showing that the letter was what he purported it to be. *See* Ariz. R. Evid. 901(a). Thus, the trial court properly excluded the letter.

### 3. Exclusion of Expert Testimony

**¶29** Holmes argues finally that the trial court erred in excluding portions of the proffered testimony of his expert witness. We review a ruling on the admissibility of expert testimony for abuse of discretion. *State v. Varela*, 178 Ariz. 319, 325, 873 P.2d 657, 663 (App. 1993). A trial court may admit expert testimony if scientific, technical, or other specialized knowledge will assist the trier-of-fact to determine a fact in issue. Ariz. R. Evid. 702; *State v. Hyde*, 186 Ariz. 252, 276, 921 P.2d 655, 679 (1996). A court may, however, exclude otherwise admissible expert testimony if its probative value is substantially outweighed by a danger of misleading the jurors. Ariz. R. Evid. 403; *State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 13, 325 P.3d 996, 1000 (2014).

**¶30** The trial court did not err because the testimony was not relevant to any material issue, and even if it was, it would mislead the

jurors. The expert testified on voir dire that the studies he relied on to connect methamphetamine use with increased suicidal ideation addressed people who were "dependent" on methamphetamine. But Holmes presented no evidence that the victim was dependent on methamphetamine or that she met any of the individual factors for dependence. The expert admitted that "[t]he only thing we know is that she took enough drug [sic] to give her those blood concentrations." Also, Holmes presented no evidence about how long the victim had used methamphetamine or if she used it more than once. The expert admitted that the instance of use before her death could have been the only time the victim used the drug and that any suggestion the victim could have used the drug over a period of several days was a guess. In short, nothing in the record connected the studies the expert relied on to the facts of this case. Consequently, the court did not abuse its discretion in excluding the expert's proffered testimony.

**CONCLUSION**

¶31        For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama