NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ROBERT JOEARL STEWART, *Appellant.*

No. 1 CA-CR 15-0156
FILED 11-8-2016

Appeal from the Superior Court in Maricopa County
No.  CR 2013-111961-001
The Honorable Virginia L. Richter, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Adele G. Ponce
*Counsel for Appellee*

The Nolan Law Firm, PLLC, Mesa
By Cari McConeghy Nolan
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Kenton D. Jones delivered the decision of the Court, in which Judge Randall M. Howe and Judge Donn Kessler joined.

---

**J O N E S**, Judge:

¶1          Robert Stewart appeals his conviction and sentence for aggravated assault.  For the following reasons, we affirm.

**FACTS[1] AND PROCEDURAL HISTORY**

¶2          At 1:29 a.m. on March 9, 2013, Officer William Tunis responded to a dispatch report of a physical altercation between two men at a trailer park.  When Officer Tunis arrived, Melissa D. and James M. were standing outside Melissa's residence, and the victim was lying on the floor surrounded by "a huge puddle of blood."  Initially, Officer Tunis believed the victim was dead but was able to rouse him after repeatedly calling his name.  The victim then sat up, complained of pain in his head, teeth, and leg, and reported that he could no longer see out of one eye.  During this brief interaction, the victim also told Officer Tunis that Stewart had assaulted him with a metal pipe.  At that point, medical personnel arrived and transported the victim to the hospital.

¶3          Officer Thomas Elliff also responded to the 1:29 a.m. dispatch call.  As he arrived, an air unit informed him a male subject was seen exiting the complex.  Officer Elliff located and approached the subject, later identified as Stewart, and observed him to be sweaty, nervous, agitated, and shaky.  When asked to sit down, Stewart complied and then told Officer Elliff that he had just been punched but blacked out after he was hit and did not remember anything else.

¶4          Officer Elliff then went to Melissa's residence, where he spoke with Melissa and James, who were still standing outside.  James stated he was outside the trailer with Melissa when he heard fighting inside.

---

[1]          Although the witnesses' testimony conflicts on various points, we view the facts in the light most favorable to sustaining the conviction.  *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013) (citing *State v. Stroud*, 209 Ariz. 410, 411, ¶ 6 (2005)).

Concerned, James entered the trailer and saw Stewart on top of the victim with an object in his hand. James then screamed "you're going to kill him" and pushed Stewart off the victim.

¶5        Officer Elliff confronted Stewart with James' and Melissa's statements. In response, Stewart told Officer Elliff that he, Melissa, and James repeatedly asked the victim to leave. After the victim refused, Stewart "grabbed a piece of rebar" near the residence with the intent "to intimidate" the victim into leaving. Stewart claimed he then reentered the residence and ordered the victim to leave; the victim then punched him and grabbed at the rebar. Although "he didn't mean to hit [the victim] with it," Stewart admitted he "probably" hit the victim with the rebar a few times. Stewart then acknowledged he repeatedly hit the victim until James "pushed" him away. Once James intervened, Stewart exited the residence, dropped the rebar near a tree, and walked away where he was eventually approached by Officer Elliff.

¶6        The State proceeded to trial against Stewart on one count of aggravated assault in 2013. Stewart was retried in 2014 after the first trial resulted in a hung jury.

¶7        At the 2014 trial, the victim testified he met Stewart while both were residents of a halfway house. During their stay, the men bonded and the victim considered Stewart his best friend. The victim met Melissa at the same time because her husband was also a resident and began a sexual relationship with her. When the victim later learned Stewart and Melissa also had a sexual relationship, he was upset because he felt Stewart had chosen Melissa over their friendship.

¶8        According to the victim, Melissa invited him to her residence on March 7, 2013, but he did not respond to the invitation. The following evening, however, the victim went to Melissa's residence after work. When he arrived, Stewart was drinking with Melissa and the victim joined them. After a few drinks, James arrived and "disrespected" him. The victim then left and went to a nearby convenience store to buy juice and more alcohol. When the victim returned, he drank more and then fell asleep in a bedroom. He awoke in the hospital with no recollection of any fight with Stewart or conversation with Officer Tunis. When later interviewed, he stated he did not believe Stewart would hurt him. As a result of the attack, the victim now suffers from permanent vision loss in his right eye, nerve damage in his face, and mental impairment.

¶9          James testified he was sharing drinks with Melissa and Stewart at Melissa's home when the victim arrived unexpectedly. The victim was intoxicated and belligerent but soon calmed down and joined the others for drinks. The victim resumed his aggressive demeanor later that evening, however, and stated he was going to spend the night and would "kill" anyone who tried to make him leave. He then retired to a back bedroom. After the three friends walked to a nearby convenience store to discuss the situation, James offered to return to the residence to ask the victim to leave. The victim refused, and James decided to leave. Stewart arrived as James was exiting and informed James he would "get him out" and would use violence if necessary. James noticed Stewart held a metal pipe in his hand and, concerned, followed Stewart back inside. James heard Stewart tell the victim, "I'm going to kill you." By the time James reached the back bedroom, the victim was lying on the ground. James yelled, "stop, you're going to kill him," and Stewart ran out of the trailer.

¶10         Stewart testified in his defense. According to Stewart, the victim had a knife on the night of the incident and threatened to stab the others if they tried to make him leave. Frightened, James, Melissa, and Stewart fled the trailer and went to a nearby convenience store. While there, Melissa met a young couple and told them about the situation. The young woman offered to talk to the victim on Melissa's behalf, and they all walked back to the residence. When the couple entered the residence, the victim "threw the girl out" and punched the young man. Witnessing this assault, and believing the victim would use his knife to attack, Stewart grabbed a nearby piece of rebar. The victim then threatened to kill Stewart and grabbed onto the rebar. A physical altercation ensued, with Stewart and the victim each trying to wrangle the rebar from the other. The wrestling ended when the victim said "I give up." At that point, Stewart left the trailer.

¶11         The jury convicted Stewart as charged. The jury also found the State proved the assault caused physical, emotional, or financial harm to the victim. The trial court sentenced Stewart to an aggravated term of ten years' imprisonment. Stewart timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes sections 12-120.21(A)(1),[2] 13-4031, and -4033(A)(1).

---

[2]      Absent material changes from the relevant date, we cite a statute's current version.

**DISCUSSION**

## I.        Conflict of Interest

**¶12**        Stewart first argues the Maricopa County Public Defender's Office (MCPDO) had a conflict of interest because it represented the victim in several unrelated matters before representing Stewart in this case. Stewart argues he did not waive the conflict and it prejudiced him because it caused trial counsel to forego impeachment of the victim regarding his prior convictions.   Essentially, Stewart makes a claim for ineffective assistance of counsel predicated on a perceived conflict of interest. *See State v. Bennett*, 213 Ariz. 562, 567, ¶ 21 (2006) (noting a colorable claim for ineffective assistance of counsel must include a showing "both that counsel's performance fell below objectively reasonable standards and that this deficiency prejudiced the defendant") (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  Because a claim of ineffective assistance of counsel may be raised only in a petition for post-conviction relief, we do not address it.  *See State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9 (2000) ("[I]neffective assistance of counsel claims are to be brought in Rule 32 proceedings.  . . . Any such claims improvidently raised in a direct appeal . . . will not be addressed by appellate courts regardless of merit.").

## II.        *Brady* Material

**¶13**        Stewart also argues the State failed to adequately disclose one of the victim's prior convictions in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding a defendant has a due process right to discover information both material and exculpatory).  Although Stewart raised this claim of a *Brady* violation during the 2013 trial, he did not raise the issue at the 2014 trial.

**¶14**        The record reflects Stewart moved to continue the 2013 trial upon discovering the victim had a previously undisclosed prior felony conviction out of Illinois.  After a hearing on Stewart's subsequent motion to compel information regarding the victim's criminal history, the trial court determined Stewart had already requested documents to substantiate the victim's Illinois conviction and denied the motion to compel, concluding Stewart would receive the necessary information through his own efforts.  At the 2013 trial, defense counsel cross-examined the victim regarding the Illinois conviction, eliciting admissions that the conviction was for aggravated battery and that the victim had pled guilty. Stewart did not make any further requests for information regarding the victim's Illinois conviction, did not cross-examine the victim on the issue in the 2014

trial, and affirmatively acknowledged, through counsel, during the 2014 trial he "wasn't planning on going into" the victim's prior felony conviction. Because Stewart failed to preserve the issue, *see State v. Anderson*, 210 Ariz. 327, 336, ¶ 18 (2005) (holding objection at first trial does not preserve error for appellate review of second trial), we review only for fundamental, prejudicial error, *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 19-20 (2005).

¶15 To satisfy its disclosure requirements under *Brady*, the State is required "to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). Accordingly, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,'" the State must disclose all evidence affecting the witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The State is not required to disclose evidence outside of its control. *See* Ariz. R. Crim. P. 15.1(f) (setting forth the scope of a prosecutor's disclosure obligation to include materials and information in the possession of any agency or person "under the prosecutor's direction and control"); *see also Ritchie*, 480 U.S. at 57.

¶16 Applying those principles here, we find no error. The record reflects the State disclosed its knowledge of the victim's prior criminal history, including the location and nature of the offense. Although Stewart argues the State was required to produce records substantiating the Illinois conviction, the trial court found the prosecutor did not possess any records regarding the conviction, and Stewart does not argue otherwise. The State's inability to produce supporting documentation from a separate governmental entity not under its control was not a *Brady* violation.

¶17 Moreover, even if we were to assume error, Stewart has failed to demonstrate prejudice. Stewart's counsel effectively cross-examined the victim regarding the Illinois conviction in the 2013 trial without relying on documentation. We have no reason to believe the examination of the victim in the 2014 trial would have been hamstrung by a lack of supporting documentation had counsel attempted to impeach the victim with his criminal history. Indeed, even in the absence of the documentation, the victim admitted having a prior criminal history on direct examination. On this record, Stewart has failed to prove either error or prejudice in the State's disclosure of the victim's criminal history.

### III.    Comments on Stewart's "Silence"

¶18    Stewart argues the prosecutor impermissibly commented on his silence at various points during the trial, thereby infringing on his constitutional rights. We review constitutional issues *de novo*. *State v. Nordstrom*, 230 Ariz. 110, 115, ¶ 17 (2012) (citing *State v. Roque*, 213 Ariz. 193, 217, ¶ 89 (2006)).

¶19    During opening statements, the prosecutor remarked that "[Stewart] never told Officer Elliff . . . all the details associated with the facts of this case. . . . Officer Elliff gave him the opportunity, and you're going to hear that he didn't — he didn't tell him all these details." While presenting his case-in-chief, the prosecutor asked Officer Elliff whether Stewart told him, "at any point," that the victim had a knife, and Officer Elliff answered that Stewart did not mention a knife. Later, while cross-examining Stewart, the prosecutor suggested Stewart never told anyone about the knife until trial, and Stewart denied the assertion, stating he had informed his first attorney that the victim had a knife. As a follow-up, the prosecutor asked whether Stewart told any police officers that the victim had a knife, and Stewart responded that he did not tell Officer Elliff that the victim had a knife, but he did tell two other officers, neither of whom wrote a report. The prosecutor then asked whether Officer Elliff provided Stewart with the opportunity "to tell [his] full story." Defense counsel objected, arguing the question improperly commented on Stewart's right to remain silent. The prosecutor responded that he was not commenting on Stewart's right to remain silent because Stewart "was talking to all of these officers." After the trial court overruled the objection, Stewart stated that he answered all of the questions Officer Elliff posed to him and acknowledged he never told Officer Elliff about the knife but explained that was because "[h]e never asked me."

¶20    The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. A defendant therefore has the right to remain silent when it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951). This privilege against self-incrimination "generally is not self-executing," meaning a person "who desires its protection must claim it." *Salinas v. Texas*, 133 S. Ct. 2174, 2178 (2013) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427 (1984)). Thus, in a non-custodial setting, a claim of the privilege must be

affirmative and express, such that a person does not invoke the privilege by merely remaining silent in response to questioning. *Id.* at 2181.

**¶21** Moreover, a defendant who speaks voluntarily has not remained silent, *Anderson v. Charles*, 447 U.S. 404, 408 (1980), and a prosecutor may therefore discuss statements a defendant has voluntarily made without commenting on the accused's right to remain silent, *State v. Raffaele*, 113 Ariz. 259, 262 (1976) (rejecting the defendant's argument that the prosecutor violated his Fifth Amendment rights by commenting on his failure to give a complete explanation at the scene and concluding "the prosecutor could not have been commenting on the accused's right to remain silent because the accused did not keep silent"); *see also Charles*, 447 U.S. at 409 (concluding a prosecutor may demonstrate inconsistencies between descriptions of an event that "involve 'silence' insofar as [each] omits facts included in the other version"). As a corollary, a prosecutor may impeach a defendant who has made "new exculpatory statements at trial" with his earlier, voluntary statements made to police officers. *State v. Tuzon*, 118 Ariz. 205, 207 (1978).

**¶22** In this case, Stewart neither claims he was subjected to custodial interrogation nor suggests that he invoked the Fifth Amendment privilege during Officer Elliff's questioning. His responses to Officer Elliff were therefore voluntary, he did not remain "silent" for purposes of the Fifth Amendment, and the prosecutor did not commit any misconduct by demonstrating inconsistencies between Stewart's trial testimony and his earlier statements, or arguing Stewart's failure to mention a knife to Officer Elliff belied his self-defense claim at trial.

### IV.    Preclusion of Written Statement

**¶23** Stewart argues the trial court improperly excluded James' written statement to law enforcement and thereby denied Stewart his constitutional right to present a full defense. Specifically, Stewart contends he should have been permitted to introduce James' written statement to impeach James' trial testimony that he overheard Stewart threaten to kill the victim. We generally review a trial court's evidentiary ruling for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006) (citing *State v. Tucker*, 205 Ariz. 157, 165, ¶ 41 (2003)). To the extent a defendant sets forth a constitutional claim by asserting that the evidence was necessary to his defense, however, we conduct a *de novo* review. *Id.* (citing *Lilly v. Virginia*, 527 U.S. 116, 137 (1999)).

¶24        During her cross-examination of Officer Tunis, Stewart's counsel elicited testimony that Officer Tunis was the "witnessing officer" to the written statement James prepared at the scene. When counsel moved to admit the written statement into evidence, the prosecutor objected on hearsay grounds. Defense counsel responded that the statement was a present sense impression, and therefore an admissible exception. The trial court instructed defense counsel to lay foundation to establish the written statement qualified as a present sense impression. In response to defense counsel's questions, Officer Tunis testified only that the written statement was prepared on March 8, 2013. The court found defense counsel had only established the date the written statement was prepared, not the time, and the evidence was insufficient to conclude that the statement was prepared sufficiently close in time to the underlying events to qualify as a present sense impression. Based on this ruling, defense counsel informed the court that she would attempt to locate dispatch information that may help with the time frame, and asked that the officer not be excused. Later, during the defense's case-in-chief, defense counsel recalled Officer Tunis to confirm that he left the crime scene at 3:00 a.m., but did not attempt to introduce James' written statement at that time.

¶25        On appeal, Stewart does not challenge the trial court's finding that defense counsel failed to lay sufficient foundation that James' written statement was a present sense impression. Rather, he argues only that the statement should have been admitted to impeach James' testimony. Because Stewart did not seek to introduce the written statement for impeachment purposes at trial, we review only for fundamental, prejudicial error. *See Anderson*, 210 Ariz. at 336, ¶ 18; *Henderson*, 210 Ariz. at 567, ¶¶ 19-20.

¶26        James was not available to testify at the 2014 trial, so his testimony from the 2013 trial was read to the jury in its entirety. Thus, the jury heard Stewart's counsel impeach James regarding his claim that he overheard Stewart threaten to kill the victim, including the following exchange:

> Q: [Y]ou made some statements about overhearing things that [Stewart] was saying to [the victim]. Do you remember that? You just testified that you heard [Stewart] say: I am going to kill you; correct?

> A: When he was — when he was swinging, that's what he was saying.

Q:  Okay.  And you can agree that your memory about this incident was better in March when it happened than today; correct?

A:  Right.

Q:  And in your written statement, you didn't put anything like that; did you?

A:  I don't know.  I don't know.  I don't recall.

. . .

Q:  That's your written statement you gave to the police that night?

A:  Yes, sir.

Q:  And nowhere in that written statement does it say:  I heard [Stewart] say I'm going to kill you?

A:  No, I don't think so.

Q:  So that's something you added today while you're testifying?

A:  It wasn't added.  That's what I recall.

. . .

Q:  But it's nowhere in there, that statement?

A:  No.

Defense counsel also elicited an admission from James that he never claimed to have overheard Stewart's threat during his pretrial defense interview.

¶27        Because Stewart did not seek to introduce the written statement as impeachment material at the 2014 trial, we cannot say the trial court erred by excluding it as inadmissible hearsay.  Even assuming the exclusion of the statement was error, however, Stewart has failed to demonstrate any prejudice.  The jury heard Stewart's counsel thoroughly impeach James' testimony with the substance of his written statement.  Stewart has not explained on appeal how the introduction of the written

statement itself would have provided greater impeachment material than that already presented to the jury. Therefore, we find no error, much less fundamental, prejudicial error.

## V.       Admission of Police Report

**¶28**          Stewart contends the trial court erred by admitting a police report comprised of hearsay and other act evidence. Because neither the police officer who created the report nor the victim who provided the statements contained in the report was testifying when the report was introduced, Stewart also argues the admission of the report violated his constitutional right to confront witnesses.

**¶29**          Before the 2013 trial, Stewart moved *in limine* to preclude the State from introducing other act evidence memorialized in a police report. Specifically, Stewart sought to preclude the victim's statements alleging Stewart: (1) used illegal drugs on March 8, 2013; (2) possessed illegal drugs on March 8, 2013; (3) sold illegal drugs; and (4) "pimp[ed] out a girl." The trial court granted the motion and instructed the victim not to mention any of the enumerated allegations while testifying.

**¶30**          At the 2014 trial, Stewart testified he had reviewed several police reports, including the statements the victim, Melissa, and James gave to police officers. On redirect, Stewart testified he had reviewed Officer Jeffrey Ferrell's report and believed it to be consistent with his own trial testimony. The prosecutor objected to the questioning as an improper attempt to "bring[] in the contents of the police report to try to prove or disprove what is actually in the report." The trial court overruled the objection to the extent Stewart was referring to his own statements and not those of the other witnesses.

**¶31**          Later, in response to a jury question, Stewart testified the victim had threatened James when James asked the victim to leave and claimed James had reported the victim's threat to Officer Elliff. Stewart continued, stating the victim had reported the two had wrestled over the rebar and claiming a statement to that effect was in Officer Ferrell's report, which the prosecutor likewise intentionally withheld from the jury. He also accused the prosecutor of intentionally withholding the contents of the police report from the jury.

**¶32**          On recross-examination, Stewart again attempted to bolster his testimony that he and the victim wrestled over the rebar by claiming it was consistent with the contents of Officer Ferrell's police report. He also expressed "frustration" that the prosecutor was objecting to the admission

11

of that evidence because "the jury should know." In response to this testimony, the prosecutor moved to introduce Officer Ferrell's police report into evidence, arguing Stewart had "put the contents of that into question in this case." Defense counsel objected, suggesting the report may be inadmissible under the law of the case and arguing the victim's allegations that Stewart participated in unrelated criminal activity were inadmissible under Arizona Rules of Evidence 403 and 404(b). The trial court overruled the objection and admitted the exhibit.

¶33 Without objection, the prosecutor then asked Stewart to identify the relevant portion of the police report detailing the victim's alleged statement that he and Stewart had struggled over the rebar. Stewart read a portion of the report aloud, in which the victim stated he was injured while attempting to wrestle a pipe away from an unidentified male. Without objection, the prosecutor then asked Stewart whether the victim had identified Stewart as the unidentified male, and Stewart agreed that the victim had not and had even expressed disbelief that Stewart would hurt him.

¶34 Although the prosecutor and Stewart each referred to the police report, neither referenced any allegations of unrelated criminal activity contained in the report. Equally important, the record reflects that the exhibit was not ultimately received in evidence and therefore was not viewed by the jury. Accordingly, none of the prejudicial allegations precluded by the trial court's motion *in limine* ruling were brought before the jury's consideration. Indeed, the only portion of the report presented to the jury was the victim's statement that he and an unidentified male wrestled over the rebar.

¶35 Stewart did not object to the admission of the police report on hearsay or Confrontation Clause grounds, nor did he object to the prosecutor's questions referencing the report, and therefore did not preserve the issue on those bases. *See State v. Lopez*, 217 Ariz. 433, 434-35, ¶ 4 (App. 2008) ("[A]n objection on one ground does not preserve the issue [for appeal] on another ground.") (citing *State v. Hamilton*, 177 Ariz. 403, 408 (App. 1993)). Accordingly, we review solely for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567, ¶¶ 19-20.

¶36 When "one party injects improper or irrelevant evidence or argument, the 'door is open' and the other party may have a right to retaliate by responding with comments or evidence on the same subject," even if such evidence would be inadmissible otherwise. *Pool v. Superior Court*, 139 Ariz. 98, 103 (1984) (citing *State v. Woodward*, 21 Ariz. App. 133

(1973), and 1 M. Udall & J. Livermore, Arizona Practice, *Law of Evidence* § 11 at 11 (2d ed. 1982)); *see also State v. Fish*, 222 Ariz. 109, 124 n.11, ¶ 48 (App. 2009) (explaining how the prosecutor's remarks regarding the victim's demeanor opened the door for the defendant to introduce prior act evidence to show the victim's state of mind). In essence, the "open door" doctrine prohibits a party from complaining about a result he caused. *State v. Lindsey*, 149 Ariz. 472, 477 (1986) (quoting Udall & Livermore § 11 at 11).

¶37 As applied here, Stewart opened the door to the limited portion of the police report presented to the jury. He repeatedly claimed the prosecutor had intentionally withheld the police report from the jury because the State did not want the jury to know the victim had originally made potentially exculpatory statements. The trial court acted well within its discretion by allowing the State to question Stewart regarding the specific, narrow portions of the police report he had placed at issue.

¶38 Additionally, Stewart has not alleged, much less shown, any prejudice in the admission of information contained in the police report. The jury simply heard evidence that the victim told Officer Ferrell he struggled with an unidentified man over the rebar, sustained injuries as a result, and did not believe the man could have been Stewart. This information was not prejudicial to the defense. Therefore, the trial court did not err, much less commit fundamental, prejudicial error, by allowing the State to question Stewart regarding these discrete sections of Officer Ferrell's police report.

## VI. Prosecutorial Misconduct

¶39 Stewart also contends the prosecutor engaged in misconduct by: (1) implying the victim told Officer Ferrell that Stewart caused his injuries; (2) placing the prestige of the government behind the State's case; and (3) incorrectly stating the jury instruction on crime prevention. Stewart did not object on these bases in the trial court, and we therefore review only for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567, ¶¶ 19-20. Under this standard of review, the defendant must first prove that misconduct actually occurred. *State v. Edmisten*, 220 Ariz. 517, 524, ¶ 23 (App. 2009) (citing *Henderson*, 220 Ariz. at 567, ¶ 19, and then *State v. Harrod*, 218 Ariz. 268, 278, ¶ 35 (2008)). Prosecutorial misconduct is not "merely the result of legal error, negligence, mistake or insignificant impropriety." *State v. Aguilar*, 217 Ariz. 235, 238-39, ¶ 11 (App. 2007) (quoting *Pool*, 139 Ariz. at 108-09). Rather, viewed in its entirety, it is "intentional conduct" that the prosecutor "knows to be improper and prejudicial and which he pursues for any improper purpose." *Id.* (quoting *Pool*, 139 Ariz. at 108-09). After

establishing error, the defendant must then demonstrate "that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of trial." *Edmisten*, 220 Ariz. at 524, ¶ 23 (quoting *Harrod*, 219 Ariz. at 278, ¶ 35).

¶40 First, Stewart argues the prosecutor implied during his direct examination of Officer Ferrell that the victim had told Officer Ferrell that Stewart assaulted him. This claim is not borne out by the record. Rather, the prosecutor asked the officer whether, at the time he interviewed the victim at the hospital, he was informed "who the suspect may be," and Officer Ferrell stated he "had no idea who the suspect was." The prosecutor then asked when the officer learned that Stewart "was a potential suspect," and Officer Ferrell testified he did not learn that information until "[a]fter the case had already been completed at the police level." Indeed, when Officer Ferrell interviewed the victim, the victim described another man as a potential suspect and stated he did not believe Stewart, his friend, would harm him. No reasonable reading of this testimony supports Stewart's claim that the prosecutor implied the victim identified Stewart as his attacker to Officer Ferrell.

¶41 Second, Stewart contends the prosecutor improperly placed the prestige of the government behind the State's case. Specifically, Stewart claims the prosecutor "associate[d] himself with the jury" by stating the "system entrusts you [the jurors] to see through [Stewart's claim of self-defense] and make the correct decision" and explaining that the prosecutor and the jurors, together, would look at the facts. Stewart also objects to the prosecutor's request that the jurors tell Stewart "what [he] did is wrong and we, as society, cannot accept that."

¶42 There are two forms of impermissible prosecutorial vouching: (1) when the prosecutor places the prestige of the government behind its witness, and (2) when the prosecutor suggests that information not presented to the jury supports the witness's testimony. *State v. Vincent*, 159 Ariz. 418, 423 (1989) (citing *State v. Salcido*, 140 Ariz. 342, 344 (App. 1984)). In this case, the prosecutor's comments neither bolstered any witness's testimony nor suggested that information unavailable to the jury supported a witness's testimony. Instead, the prosecutor's comments, considered in context, fell within the wide latitude afforded attorneys in presenting their closing arguments to the jury. *See State v. Comer*, 165 Ariz. 413, 426 (1990).

14

¶**43**        Third, Stewart argues the prosecutor misstated the jury instruction regarding his defense of crime prevention and mischaracterized its application to this case during closing argument.  The prosecutor stated:

> Use of force in crime prevention.  If you turn to [the jury instructions regarding] burglary, that does not apply in this case.  Okay?  It doesn't apply because there's no evidence to support that the defendant entered to commit a theft.
>
> What's the accusation here in this case?  That the defendant was assaulting somebody.  So burglary doesn't apply.

¶**44**        Without question, the prosecutor's comments regarding the use of force in crime prevention were inaccurate.  First, the prosecutor incorrectly referenced Stewart rather than the victim when discussing its application to this case.  Second, the prosecutor incorrectly limited the crime of burglary to entry with an intent to commit theft.  Viewed within the context of the prosecutor's entire closing argument, however, the record reflects that this brief, incorrect comment was the result of confusion or mistake rather than intentional misconduct.

¶**45**        In any event, there is no basis to conclude the comments were prejudicial.  First, the trial court correctly instructed the jury that the attorneys' comments in closing argument were not evidence, and, regarding the defense of crime prevention as follows:

> The defendant was justified in threatening or using physical force against another if and to the extent the person reasonably believed that physical force was immediately necessary to prevent another from committing the crimes of burglary and/or aggravated assault.
>
> . . .
>
> The defendant is justified in using physical force against another person even if that person is not actually committing or attempting to commit the crimes if the defendant reasonably believed he was preventing the commission of the crimes.
>
> . . .
>
> The crime of burglary requires proof that the person:

Entered or remained unlawfully in or on a residential structure; and

Did so with the intent to commit any theft or felony therein.

We presume that the jurors followed the court's instructions, particularly where, as here, nothing in the record suggests the jurors were confused or misdirected. *See State v. Prince*, 226 Ariz. 516, 537, ¶ 80 (2011) (citing *State v. LeBlanc*, 186 Ariz. 437, 439 (1996)). Second, defense counsel properly argued to the jury that burglary encompassed entry to commit any felony. Therefore, although the cited portion of the prosecutor's argument was incorrect, it was not prejudicial to the defendant.

## VII. Verdict Form

**¶46** Finally, Stewart argues the trial court erred by failing to provide the jurors with a separate form of verdict for each of his affirmative defenses, self-defense, and crime prevention. Specifically, he argues that because the burden of disproving a defense shifts to the State once the defendant has supported the defense with some evidence, the failure to provide the jurors separate forms of verdict relieved the State of its constitutional obligation to prove guilt beyond a reasonable doubt. Stewart did not object to the verdict form in the trial court. We therefore review solely for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 568, ¶¶ 19-20.

**¶47** Stewart has not cited, and our research has not revealed, any authority for the proposition that a trial court must provide jurors with a separate form of verdict for affirmative defenses. To the contrary, Arizona Rule of Criminal Procedure 23.2(a) provides that juries must return general verdicts, simply "finding the defendant either guilty or not guilty." The enumerated exceptions to this rule are limited to insanity verdicts, separate verdict forms for different counts or offenses, specific verdicts for offenses divided into degrees, aggravation verdicts, and capital verdicts. Ariz. R. Crim. P. 23.2 (b)-(f). Thus, under Rule 23.2(a), jurors considering affirmative defenses nonetheless render a general verdict.

**¶48** Because the trial court properly instructed the jury regarding the defenses and "the need for a jury finding beyond a reasonable doubt that the defenses were not established" and the verdict form was in accordance with Rule 23.2(a), we find no error, much less fundamental, prejudicial error, in the court's submission of a general verdict form to the jury.

## CONCLUSION

¶49     Stewart's conviction and sentence are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA