NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

TROY MICHAEL NASH, *Appellant.*

No. 1 CA-CR 23-0188, 1 CA-CR 23-0422
(Consolidated)
FILED 08-20-2024

---

Appeal from the Superior Court in Maricopa County
No. CR2022-001520-001
The Honorable David W. Garbarino, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Celeste Kinney
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jennifer Roach
*Counsel for Appellant*

------

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Jennifer B. Campbell joined.

------

**B R O W N**, Judge:

**¶1**          Defendant Troy Nash appeals his conviction and resulting sentence for fraudulent schemes and artifices, a class two felony. He argues the trial court erred by not granting a mistrial for alleged jury misconduct, by not admitting statements from an unavailable witness, by admitting irrelevant and unfairly prejudicial evidence, and because the verdict was against the weight of the evidence. Because Nash has not shown reversible error, and because there was substantial trial evidence to support his conviction, we affirm.

## BACKGROUND

**¶2**          Nash was an automobile wholesaler who did business through his company, Kofa Auto Brokers, Inc. ("Kofa"). Between 2015 and 2019, a large part of his business consisted of buying used cars from one dealership, Mercedes-Benz of Scottsdale ("MBS"), and selling them for a profit to another dealership, Certified Benz and Beemer ("CBB"). Nash would first negotiate a price with David Robinson, the general sales manager of MBS. After agreeing on a price, Robinson would let Nash take the car to find a buyer. In the meantime, Robinson would send the purchase order to MBS's accounting office to ensure the car's title was clear and ready to transfer. Nash would then meet with CBB's co-owner and general manager, Jack Schneider, to discuss selling the car to CBB. Once a deal was finalized, CBB took control of the car. When the car's title was ready, Nash would pick it up from MBS and pay for the car.

**¶3**          After that, Nash would notify CBB's title clerk, Felicia Nall, who then prepared a check for the purchase price. Once Schneider had signed the check, Nash went to CBB and delivered the title to Nall in exchange for the check. Under CBB's policy, wholesalers could not receive the check without delivering the title. However, at some point, and at Nash's request, Nall began releasing checks to him before he delivered the title (floating him checks). Both Nash and Nall were aware of CBB's policy, yet Nall floated Nash checks because he promised to deliver the title within

a day or two, and she trusted him to make good on those promises. Nall estimated that she floated checks to Nash on 250 of the approximately 500 cars he sold to CBB between 2016 and 2019, and most of the time, he would deliver the title within a day or two, as promised. No one else at CBB knew about Nall floating the checks.

¶4            In July 2018, MBS instituted a new policy requiring Nash to pay for any titles more than 30 days outstanding before he could pick up newer titles. The 30-day clock began when the title was ready for pickup. MBS's office manager, Tricia Washburn, communicated this policy to Nash and generally enforced it outside of a few exceptions. Later in 2018, Nash began taking longer and longer to deliver titles to Nall. He provided various excuses for the delays, including that he was waiting on money from wholesalers in Washington, he was out of town, or he was playing golf. Nall grew concerned but continued floating him checks, hoping it would allow him to get caught up, as he was still bringing in titles, just later and later. Unbeknownst to Nash, Nall began doctoring a shared CBB spreadsheet to hide missing titles. Toward the end of January 2019, Nall informed her supervisor, Amanda Powell, about certain checks she released to Nash without receiving title, but she did not explain the full extent of the situation. On January 29, 2019, Nall refused to float Nash a check, directing him to talk to Powell about it. Nall did not float him any more checks after that.

¶5            On February 20, 2019, Schneider discovered that CBB had paid Nash for a car, but CBB did not have the title. CBB then conducted an audit and discovered that between November 2018 and January 2019, it had paid Nash a total of $569,300 for 17 cars, for which CBB did not have titles, and the dealership had already resold 14 of them. The next day, Schneider and CBB co-owner Mark Lerner met with Nash, who promised to provide them the 17 titles within a week. Nash came back a week later and requested more time, and Schneider obliged. But after another week passed, Schneider told Nash he had no more time to wait. Soon after, Schneider discovered that MBS had the 17 titles, and on March 7, he called MBS requesting them. Both dealerships immediately stopped doing business with Nash, and as a result, Kofa apparently became insolvent and Nash declared bankruptcy.

¶6            Several weeks later, MBS's owner, Charles Theisen, filed a police report detailing the situation. The report included a statement from Theisen indicating that after Nash had arranged a buyer for a car, he had 90 days to pay for it and receive the title. Meanwhile, CBB sued MBS, but the dealerships ultimately settled their dispute, with CBB paying MBS

$361,000 for the 17 titles. As a result, MBS received about $200,000 less than Nash was supposed to pay for the 17 cars. For CBB, it paid $361,000 on top of the $569,300 it had already paid Nash for the cars.

¶7 In May 2022, Nash was charged with one count of fraudulent schemes and artifices, two counts of theft by control, and five counts of theft by misrepresentation, all class 2 felonies. He pled not guilty to all counts. Nash filed a pretrial motion in limine seeking to preclude evidence of his personal finances and debts from being admitted at trial, arguing it was irrelevant or, alternatively, unfairly prejudicial. In response, the State argued that Nash's finances were relevant to show that he knew he could not pay for the titles. The court denied the motion, finding that his personal finances were "relevant to his motivation and intent."

¶8 Trial was set for March 2, 2023. The State originally planned to call Theisen as a trial witness, but he began suffering from a serious medical condition. Before trial, the State was alerted to Theisen's condition and notified defense counsel in writing on February 16, 2023 that he would likely be unable to testify. The State submitted a statement from Theisen's physician recommending that he not participate in the proceedings due to health concerns. At a hearing on February 22, the parties discussed the possibility of Theisen testifying virtually, and the court informed Nash if he wanted Theisen to testify, he would probably need to continue the trial to allow Theisen to recover. Nash opted not to request a continuance and instead subpoenaed Theisen, hoping he could testify virtually.

¶9 The following day, Nash moved to admit statements from Theisen's email contained in the police report if Theisen was unavailable, under the residual hearsay exception of Arizona Rule of Evidence ("Rule") 807. The court denied the motion, finding that Nash had not shown that Theisen's statements were "supported by sufficient guarantees of trustworthiness." Ariz. R. Evid. 807(a)(1). On March 2, the first day of trial, Theisen moved to quash the subpoena ordering him to testify. On day two of trial, the State called Vern Foutz, the general manager of MBS. He testified that Theisen was not involved in MBS's day-to-day operations, that he had briefed Theisen on the Nash situation before Theisen filed the police report, and that Theisen had no prior knowledge of Nash.

¶10 The next day, after argument from Theisen's attorney, the court granted his motion to quash the subpoena. With Theisen officially unavailable, Nash again requested that the court admit Theisen's statements under the residual hearsay exception. *See* Ariz. R. Evid. 807. The court denied the request, reaffirming that the statements do not meet

Rule 807's trustworthiness requirement, especially in light of Foutz's testimony.

¶11          Washburn testified during day three of the trial. While breaking for lunch, the court received the following written question from Juror 3:

> "I am concerned about Juror 9's ability to judge this case fairly and impartially based on several statements he has made in the Jury Chambers: 1) On Monday, 3/6, Juror 9 stated: 'I'm surprised the questionnaire didn't ask about our opinions on used car salesmen because most people think they're all scam artists.' 2) On Tuesday, 3/7, Juror 9 said, 'I'm not sure why they even have us here, the verdict is already obvious.' 3) On Tuesday, 3/7, Juror 9 said he didn't know we weren't allowed to discuss the case yet among jurors."

¶12          After conferring with the attorneys, the court and the attorneys then questioned each juror individually.[1]  Juror 3 estimated that five or six jurors heard the "used car salesmen" comment, and the "vast majority" heard the "I'm not sure why we're here" comment.  Juror 9 acknowledged making the "used car salesmen" comment but claimed to "[not] really have an opinion on them."  Juror 9 also acknowledged making the "I'm not sure why we're here" comment and explained: "So far a lot of [the trial] has been in regards to the debts, not in regards to the charges that are being brought up."  Six other jurors reported hearing this comment. Additionally, two jurors reported that some jurors had been discussing the case, but only about trying to understand the structure of each business and how the witnesses fit within that structure.

¶13          It also came out that Juror 11 made a remark about wanting to hear Nash testify, and Juror 10 responded that they did not think that would happen.  When asked about it, Juror 11 explained: "I just would like to hear his side of the story is all, you know?  Everybody is talking about it from their point of view and I wanted to hear him say it from his own words."  Juror 10 explained that experience watching television shows led Juror 10 to believe that Nash would not testify.  Three other jurors reported hearing this discussion.

¶14          In total, five jurors reported hearing no discussion of the case. Six of the other nine jurors confirmed that they could remain fair and

---

[1]          There were 14 jurors at trial, two of whom were alternates.

impartial, while Jurors 3, 9, and 15 were never asked that question. After the questioning, the State asked that Juror 9 be removed, and Nash moved for a mistrial, citing concerns about the jury holding it against him if he did not testify. The court denied the motion for a mistrial and expressed its intent to release Juror 9. Nash, however, objected, and the court kept Juror 9 on the jury. The court then reread the pertinent preliminary instructions to the jury, including a portion of the admonition, reminding the jurors not to "discuss any aspect of the case with each other" until deliberations.

¶15        The State then called Nall, Schneider, and a detective as witnesses. After the State rested in its case in chief, Nash moved for a judgment of acquittal, which the court denied, and Nash did not call any witnesses. Before closing arguments, the court expressed concern about Schneider's potentially prejudicial testimony that Nash had used CBB's money to go to Hawaii, upgrade his wife's wedding ring, and buy a house. After discussion, the State agreed not to reference the vacation or the wedding ring in closing but did plan to reference a check from Kofa paid to "escrow" in January 2019. The court ultimately decided against instructing the jury not to consider the purchases, and the State referenced the escrow payment in closing.

¶16        The jury found Nash guilty of fraudulent schemes and artifices, not guilty on five theft counts, and failed to reach a verdict on the other two theft counts, for which the court declared a mistrial and dismissed without prejudice. Nash filed a motion for new trial, which the court denied. After being sentenced as a repetitive offender to 9.25 years' imprisonment, Nash timely appealed, and we have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1), (2).

## DISCUSSION

¶17        Nash argues the trial court erred by (1) denying a mistrial for jury misconduct, (2) precluding Theisen's statements, (3) failing to preclude evidence of Nash's personal expenditures, and (4) denying a new trial on these three grounds, and because the verdict was against the weight of the evidence.

## I.        Juror Misconduct

¶18        Nash contends the trial court abused its discretion by denying his motion for a mistrial after multiple jurors had discussed the case, in violation of his right to a fair and impartial jury. *See State v. Clabourne*, 142 Ariz. 335, 344 (1984) ("A defendant has the right to a fair and impartial jury."); *State v. Macias*, 249 Ariz. 335, 339, ¶ 11 (App. 2020) ("[J]urors in a

criminal case are not to discuss trial evidence amongst themselves until the conclusion of evidence."). Granting a new trial for juror misconduct is warranted "only if a defendant shows actual prejudice or if prejudice may be fairly presumed from the facts." *State v. Burns*, 237 Ariz. 1, 26, ¶ 112 (2015). "But '[p]rejudice cannot be presumed'" unless "'the jury received and considered extrinsic evidence on the issues.'" *State v. Nelson*, 229 Ariz. 180, 185, ¶ 12 (2012) (citation omitted). Here, because there is no showing that the jury considered extrinsic evidence, Nash had to show actual prejudice. *See id.*

**¶19**       Mistrial is the "most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Speer*, 221 Ariz. 449, 462, ¶ 72 (2009) (citation omitted). "The trial judge is in the best position to determine whether a particular incident calls for a mistrial because the trial judge is aware of the atmosphere of the trial, the circumstances surrounding the incident, the manner in which any objectionable statement was made, and the possible effect on the jury and the trial." *State v. Williams*, 209 Ariz. 228, 239, ¶ 47 (App. 2004). Therefore, we review the denial of a motion for mistrial for a clear abuse of discretion. *State v. Murray*, 184 Ariz. 9, 35 (1995).

**¶20**       Nash asserts that the denial of a mistrial was error because of "the pervasiveness of the jury misconduct, the timing of the violation, the jurors' lack of candor, and the number of constitutional rights affected." For the following reasons, we conclude that the trial court did not abuse its discretion.

**¶21**       First, two jurors reported discussions about the witnesses and their roles within MBS. Because these discussions do not reasonably relate to the ultimate issue of guilt, reminding all the jurors of the admonition was an appropriate response by the court. *See State v. Miller*, 178 Ariz. 555, 557 (1994) (noting that the court's response to juror misconduct "should be 'commensurate with the severity of the threat posed'") (citation omitted); *see also State v. Payne*, 233 Ariz. 484, 511, ¶ 103 (2013) (concluding the trial court did not abuse its discretion in refusing to strike a juror whose statements "did not reveal that she was biased or had made up her mind before hearing all the evidence").

**¶22**       Second, Juror 3 reported that Juror 9 commented that "most people think [used car salesmen are] all scam artists," and "I don't know why we're here." We do not consider whether Juror 9 remaining on the jury made it less impartial because Nash invited such error by objecting to Juror 9's removal. *See State v. Robertson*, 249 Ariz. 256, 260, ¶ 16 (2020)

("[T]he invited error doctrine only applies when the facts show the party urging the error initiated, or at least actively defended, the error rather than passively acquiescing in it."). Juror 3 was the only juror who reported hearing the "used car salesmen" comment, and other than Juror 3, the six jurors who reported hearing the "I don't know why we're here" comment all indicated that they could remain fair and impartial. Juror 3's responses to individual questions revealed no indication that these comments affected Juror 3's ability to be impartial. And after questioning the jurors, the court reread the admonition to the jury. The court thus did not abuse its discretion by denying Nash's motion for a mistrial based on Juror 9's comments. *See State v. Gallardo*, 225 Ariz. 560, 569, ¶ 40 (2010) (recognizing the presumption that "jurors follow the court's instructions"); *Burns*, 237 Ariz. at 26, ¶ 111 (finding no abuse of discretion in denying a motion for mistrial after jurors expressed potential bias but the court interviewed the jurors and verified they could remain impartial); *State v. Montano*, 136 Ariz. 605, 606–07 (1983) (holding it was not an of abuse discretion to refuse to dismiss a jury panel after the entire panel heard a prejudicial remark because each juror confirmed that they could remain fair and impartial).

**¶23**        Third, three jurors reported hearing the discussion between Jurors 10 and 11 about whether Nash would testify. Except for Juror 15, all jurors who reported either participating in or overhearing this discussion indicated they could remain fair and impartial. *See Burns*, 237 Ariz. at 26, ¶ 111; *Montano*, 136 Ariz. at 606–07. And Juror 15's questioning revealed no indication that hearing this discussion affected Juror 15's ability to be fair and impartial. *See Nelson*, 229 Ariz. at 185, ¶ 12. Therefore, for the same reasons laid out in the previous paragraph, the court acted within its discretion in declining to order a mistrial based on the jurors' statements about whether Nash would testify.

**¶24**        Nash argues the jurors' stories conflicted, "five jurors changed their answers in response to further questioning," and due to this "lack of candor . . . the jurors' claims that they could be fair and impartial should not have been given much weight." However, we do not assess the credibility of jurors. *See State v. Colorado*, 256 Ariz. 97, 102, ¶ 23 (App. 2023) (recognizing that trial courts have the "task of weighing credibility when a juror gives assurances of impartiality," and because they "observe and assess the juror personally," appellate courts defer to those credibility findings).

**¶25**        We also reject Nash's assertion that, because the jurors violated the admonition "only one or two days after" it was read to them, the "presumption of jurors following the jury instructions was refuted by

the jurors' conduct." Nash has not cited any authority supporting that proposition, and nothing in the record shows that the jury violated the admonition after it was reread to them. After questioning each of the jurors, instructing the jury of the admonition for a second time was an adequate and appropriate remedy, and the court did not abuse its discretion by denying Nash's motion for a mistrial.

## II.    Unavailable Witness's Statements

¶26        Before trial, Nash filed a motion requesting admission of Theisen's statements in the police report under the Rule 807 residual hearsay exception. The trial court denied the motion. Nash argues the court erred by refusing to admit Theisen's statements because they were admissible under Rule 807 and several other hearsay exceptions, and precluding the statements violated his compulsory process and due process rights. Generally, we review a trial court's ruling on the admissibility of evidence for abuse of discretion. *State v. Dann*, 220 Ariz. 351, 365, ¶ 66 (2009). When an issue is raised for the first time on appeal, we review the ruling for fundamental, prejudicial error. *See State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). Under that standard of review, Nash has the burden of showing that the error (1) went to the foundation of his case or denied him a right essential to his defense, and it prejudiced him, or (2) was so egregious as to deny him the possibility of a fair trial. *See id.* at 142, ¶ 21.

¶27        We review the court's refusal to admit Theisen's statements under Rule 807 for harmless error, but we review Nash's remaining arguments relating to those statements under the fundamental error standard of review. *See State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 18–19 (2005) ("Reviewing courts consider alleged trial error under the harmless error standard when a defendant objects at trial . . . [f]undamental error review, in contrast, applies when a defendant fails to object to alleged trial error.").

### A.    Rule 807 Residual Hearsay Exception

¶28        Nash argues the trial court erred by refusing to admit Theisen's statements under the residual hearsay exception. *See* Ariz. R. Evid. 807. Under Rule 807(a), hearsay that is not admissible under any other exception may be admitted if:

> (1) the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

*Id.* In deciding whether a statement is sufficiently trustworthy under the residual exception, courts "consider 'the spontaneity, consistency, knowledge, and motives of the declarant . . . to speak truthfully,' among other things." *Burns*, 237 Ariz. at 20, ¶ 69 (citation omitted). The trial court denied Nash's request to admit Theisen's statements under Rule 807, finding that the statements did not contain the required guarantees of trustworthiness.

**¶29** Nash first contends that Theisen's statements were not spontaneous because they "followed an internal investigation at MBS." However, a spontaneous statement is generally more trustworthy. *See State v. Tucker*, 205 Ariz. 157, 166, ¶ 42 (2003) ("We assume, as a general matter, that when the declarant has had little time to reflect on the event she has perceived, her statement will be spontaneous and therefore reliable."); *see also* Ariz. R. Evid. 803(1)–(2) (exceptions to the rule against hearsay for spontaneous statements). Thus, Nash's argument that Theisen's statements were not spontaneous weighs against admission of those statements. Nash also asserts that Theisen's statements were consistent because Theisen never "contacted the [police] to modify, correct or retract his statement." Because there is no subsequent statement or testimony from Theisen on the 90-day policy to compare with his original statements, consistency does not favor either side. Likewise, the improper motive factor is neutral.

**¶30** As to the knowledge factor, Nash argues "there is nothing in the record suggesting that [] Theisen lacked knowledge about the wholesale business or his policy for payment, [90] days from the sale date." The record shows otherwise. Both MBS employees testified that Theisen was not involved in MBS's day-to-day operations, and Foutz testified that anything Theisen learned about MBS came from Foutz. Also, according to Foutz, Theisen did not know who Nash was until Foutz briefed him shortly before filing the police report. Theisen's lack of personal knowledge of the statements' content weighs strongly against their trustworthiness. *See* Ariz. R. Evid. 602 (requiring a fact witness to have "personal knowledge of the matter" to testify about that matter). Similarly, his lack of personal knowledge leads to the conclusion that his statements to the police were not more probative as to MBS's business practices than the testimony of those who handled such matters. *See* Ariz. R. Evid. 807(a)(2).

¶31       Finally, nothing in the record corroborates Theisen's claim that MBS allowed Nash up to 90 days to pay for the cars he had arranged to sell.  Notably, neither Foutz, MBS's general manager, nor Washburn, who handled MBS's day-to-day accounting work, were aware of a 90-day policy.  Because Theisen's statements were not "supported by sufficient guarantees of trustworthiness," the court did not abuse its discretion by ruling it was inadmissible under Rule 807.  *See* Ariz. R. Evid. 807.

## B.       Rule 803(8) Public Record Exception

¶32       Nash argues Theisen's statements in the police report were admissible under the public records hearsay exception.  *See* Ariz. R. Evid. 803(8).  Under Rule 803(8), a "record or statement of a public office" is admissible if:

> (A) it sets out:
>
> . . .
>
> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

¶33       The State argues the police report is inadmissible because "Rule 803's plain language excludes matters observed by law-enforcement personnel."  *See id.*  But that exception only applies to evidence offered against a defendant in a criminal case.  *See id.*  Here, Nash offered the police report against the State, which Rule 803(8) explicitly allows.  *Id.* (stating that "factual findings from a legally authorized investigation" are admissible "in a civil case or *against the government in a criminal case*") (emphasis added).  But for the same reasons discussed in the previous section, the State has shown that the circumstances surrounding Theisen's statements "indicate a lack of trustworthiness" and are thus inadmissible under the public records exception.  *See* Ariz. R. Evid. 803(8)(B).

### C.    Rule 801(d)(2)(B) Adopted Statement

**¶34**        Nash argues Theisen's statements from the police report were admissible as non-hearsay under Rule 801(d)(2)(B),[2] which states that an opposing party's statement is not hearsay if it "is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true."  Statements are adopted when a party "affirmatively agrees . . . or expounds on the statements by adding [their] own 'explanations and comments.'"  *State v. Anderson*, 210 Ariz. 327, 339, ¶ 36 (2005) (citation omitted).

**¶35**        At the start of the police investigation, an officer interviewed Charles Theisen and included several of Theisen's statements in a report; each statement began with some variation of "Chuck stated," "Chuck advised," or "Chuck explained."  The officer also copied and pasted an email from Theisen into the report, marking it in quotation marks.  The report contained no commentary or explanation from the officer on Theisen's statements.  *See id.*  Therefore, nothing in the report suggests the officer manifested or believed Theisen's statements to be true; as such, they are not admissible as an adopted statement.  *See* Ariz. R. Evid. 801(d)(2)(B).

**¶36**        Nash argues that by merely including the statements in his report, the officer manifested his belief that they were true, contending "[i]f he believed the statement was false, he would not have investigated it."  This argument is based on a false premise.  Officers initiate investigations to determine whether allegations are true, not because they know allegations are true.  Theisen's statements are inadmissible under Rule 801(d)(2)(B).

---

[2]        Nash claims that he moved to admit Theisen's statements as a Rule 801(d)(2)(B) adopted statement during trial, pointing to three occasions when defense counsel said the statements were adopted into the police report.  But that claim is not supported by the record.  On two of the occasions, defense counsel was merely explaining which parts of the statements he wanted to admit.  In the third instance, he stated that the statements were adopted to argue that they were trustworthy under Rule 807, not that they were admissible under Rule 801(d)(2)(B).  We therefore review this argument for fundamental, prejudicial error only.  *See Escalante*, 245 Ariz. at 140, ¶ 12.

### D.    Rule 804(b)(3) Statement Against Interest

¶37        Nash argues Theisen's statements are admissible under the Rule 804(b)(3) statement against interest hearsay exception.  Under that provision, an exception to the rule against hearsay applies if: (1) the declarant is unavailable, and (2) when the statement was made, "it was so contrary to the declarant's proprietary or pecuniary interest" that "a reasonable person in the declarant's position would have only made [it] if [they] believed it to be true."  Ariz. R. Evid. 804(b)(3).

¶38        According to Nash, the following statements in the police report were contrary to Theisen's proprietary or pecuniary interests: "Nash always paid to get titles of cars he was entrusted with within 90 days of selling the cars [and . . .] Nash's time period was 90 days."  Nash argues that Theisen reporting a 90-day policy for payment instead of a 30-day policy was against Theisen's interests because it helped Nash's case, and Theisen could not recover restitution unless Nash was convicted.

¶39        Assuming, without deciding, that reporting the 90-day policy was contrary to Theisen's interests, it is unclear how Theisen would have known this when making the statements.  The MBS employees' testimony strongly indicates that Theisen was unaware of the unwritten 30-day policy, that he was not involved in day-to-day operations, and that neither employee had mentioned the 30-day policy to him.  Thus, Theisen likely did not choose to report the 90-day policy instead of a 30-day policy.  The more plausible explanation is that he reported the 90-day policy, believing it would further his interests, as such a policy would impose a deadline on Nash to pay for the cars.  Theisen's statements were not admissible under Rule 804(b)(3).

### E.    Compulsory Process

¶40        Nash asserts that the "combination of rulings, quashing the subpoena and preventing [] Nash from presenting [Theisen's] statement to the jury, violated his right to compulsory process."  "In all criminal prosecutions, the accused shall . . . have compulsory process for obtaining witnesses in his favor."  U.S. Const. amend. VI.  A criminal defendant's right of compulsory process is incorporated against the states through the Fourteenth Amendment. *See Washington v. Texas*, 388 U.S. 14, 19–20 (1967).  However, the government need not produce witnesses for the defense; accordingly, "there is no violation of the right to compulsory process when the unavailability of the witness has not resulted from the suggestion,

procurement, or negligence of the government." *State v. Stewart*, 131 Ariz. 407, 409–410 (App. 1982).

¶41        Nash first argues that quashing Theisen's subpoena violated his right to compulsory process.  He asserts that Theisen's unavailability resulted from the government's conduct because the court granted the motion to quash, and "the State filed information about [Theisen's] medical condition with the court."  Theisen's unavailability, however, was caused by his medical condition, not by the State.  Theisen's attorney moved to quash the subpoena and argued it in court, not the State.  Nash has not shown that Theisen's unavailability "resulted from the suggestion, procurement, or negligence of the government." *See id.*

¶42        Nash argues his compulsory rights were violated by the court not allowing Theisen to testify virtually, asserting that Theisen's medical information did not "address whether alternate accommodations, such as testifying by video or with frequent breaks, might address his health concerns."  Although Nash suggested virtual testimony to the court on the second day of trial, when the motion to quash was argued the next day, Nash did not request virtual testimony or ask Theisen's attorney if it would be feasible.  Because the court never denied any request for Theisen to testify virtually, there was no state action necessary for a compulsory process violation.  *State v. Ferguson*, 149 Ariz. 200, 204 (1986) ("[T]he government is under no obligation to . . . produce, witnesses for the defense.").

##### F.        The Right to Present a Complete Defense

¶43        Nash contends that excluding Theisen's statements in the police report violated his constitutional right to present a complete defense. Because Nash did not raise this objection in the trial court, we review only for fundamental error resulting in prejudice.[3] *See Escalante*, 245 Ariz. 140, ¶ 12.  "Under the Due Process Clause of the Fourteenth Amendment, criminal

---

[3]        Nash claims that he raised due process concerns in his argument to the trial court.  However, the only time defense counsel mentioned "due process" was in the middle of arguing for a mistrial and a continuance based on juror misconduct.  In the same sentence, he alleged a Confrontation Clause violation.  It is unclear whether his due process objection pertains to juror bias, Theisen's statements, or a Confrontation Clause issue.  Because "the court had no opportunity to correct [the] error," Nash failed to preserve the due process issue.  *See State v. Lopez*, 217 Ariz. 433, 435, ¶ 6 (App. 2008).

prosecutions must comport with prevailing notions of fundamental fairness," which requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense," subject to their compliance with constitutional procedural rules. *See California v. Trombetta*, 467 U.S. 479, 485 (1984); *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citing cases).

**¶44** Nash cites *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) for the proposition that applying the evidentiary rules must comport with the "fundamental standards of due process." He claims he could not present a complete defense "because the court mechanistically applied the hearsay rules." *See id.* ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice."). Yet Nash does not explain how the court mechanically applied the rules or how that application violated his right to present a complete defense. *U.S. v. Adams*, 271 F.3d 1236, 1243 (10th Cir. 2001) (noting that the defendant "confuses a fundamental right, the right to present a theory of defense, with one that is not fundamental, the right to present that theory in whatever manner and with whatever evidence he chooses"). Thus, Nash has not shown that the exclusion of Theisen's statements violated his right to present a complete defense. *See, e.g., State v. Carlson*, 237 Ariz. 381, 393, ¶ 37 (2015) (concluding that the exclusion of evidence "did not violate [defendant's] right to present a defense or to a fair trial" because he "does not explain how the trial court applied the rules of evidence in a 'mechanistic' way").

**¶45** Because Nash has not shown that the court abused its discretion in refusing to admit Theisen's statements, he has not established that error occurred, much less fundamental error resulting in prejudice.

### III.    Admission of Nash's Purchases

**¶46** Nash argues the testimony about his Hawaii trip, wedding ring upgrade, and house purchase was not relevant because there was no connection between those purchases and the funds Kofa received from CBB. "Irrelevant evidence is not admissible." Ariz. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ariz. R. Evid. 401. "We review the trial court's determination of relevance for an abuse of discretion." *State ex rel. Thomas v. Duncan*, 216 Ariz. 260, 264, ¶ 13 (App. 2007).

**¶47** To convict Nash of fraudulent schemes and artifices, the State had to prove beyond a reasonable doubt that "(1) pursuant to a scheme or

artifice to defraud, (2) [Nash] knowingly obtained any benefit, (3) by means of false or fraudulent pretenses, representations, promises, or material omissions." *State v. Griffin*, 250 Ariz. 651, 656, ¶ 17 (App. 2021); A.R.S. § 13-2310(A). Also, as the jury was instructed, the State was required to "prove that the scheme or artifice to defraud was intended to defraud, meaning it was intended to mislead another person for the purpose of gaining some benefit." *See State v. Bridgeforth*, 156 Ariz. 60, 64 (1988).

**¶48**　　At trial, Nash asserted that he did not intend to defraud and merely mismanaged his business. On appeal, the State argues, as it did at trial, that the purchases were relevant because they allowed the jury to infer "that Nash did not merely mismanage his business but instead used the money to buy a house, ring, and trip."

**¶49**　　Proving intent to defraud required the State to show Nash had no intent to deliver titles in one to two days as he had promised. *See id.* ("There is nothing illegal about a business failing and customers losing deposits," but fraud occurs "if a business receives money based on promised performance which was never intended to be carried out."). Further, intent to defraud may be proved by showing the defendant used money obtained in the scheme for personal purposes. *See State v. West*, 173 Ariz. 602, 610 (App. 1992) (concluding there was sufficient evidence to support intent to defraud in part because defendant "spent the money received in advance on personal expenditures and gambling activities"). Nash argues that, unlike what occurred in *West*, the State did not show he used CBB's money for the Hawaii trip, the wedding ring, or the house. However, no such showing is required by § 13-2310. *See Griffin*, 250 Ariz. at 655–56, ¶ 13 (noting that the application of § 13-2310 is not limited to "specific circumstances" and "must be broad enough to cover all of the varieties [of fraud] made possible by boundless human ingenuity") (quoting *State v. Haas*, 138 Ariz. 413, 424 (1983)).

**¶50**　　The jury could infer that Nash used the 17 checks from CBB to pay for his Hawaii trip, the wedding ring, and the house purchase, and in turn, it could infer that he intended to defraud CBB by using at least a portion of the money for personal purchases instead of obtaining the titles as promised. *See Griffin*, 250 Ariz. at 656, ¶ 14 ("[I]ntent to defraud, like any state of mind, may be inferred from other evidence."). So, evidence of the purchases was relevant because it had a tendency to make it more probable

that Nash used CBB's checks for personal reasons, which is consequential in proving that Nash intended to defraud CBB. *See* Ariz. R. Evid. 401.[4]

**¶51**　　　　　Alternatively, Nash argues that any probative value of the purchases was "greatly outweighed by the risk of prejudice, confusing the issues, or misleading the jury" and thus the court erred by not excluding them under Rule 403. *See* Ariz. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Nash also contends that the evidence of the purchases "created confusion for the jurors because it was offered to prove [] Nash's mental state . . . to show he enriched himself with CBB funds, which would show that pursuant to a fraudulent scheme, he knowingly obtained a benefit." However, as explained, evidence of a defendant using fraudulently obtained money for personal expenditures is a proper basis for a jury to find intent to defraud. We therefore conclude that the superior court did not abuse its discretion in finding that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. *See* Ariz. R. Evid. 403; *State v. Mott*, 187 Ariz. 536, 545 (1997) ("Unfair prejudice results if the evidence has an undue tendency to suggest decision on an improper basis . . . .").

## IV.　　Motion for New Trial

**¶52**　　　　　Finally, Nash argues the trial court erred by denying his motion for a new trial, which asserted the verdict was contrary to the weight of the evidence.[5] We review the denial of a motion for new trial for an abuse of discretion. *State v. Hoskins*, 199 Ariz. 127, 142, ¶ 52 (2000). The trial court may grant a new trial if "the verdict is contrary to law or the weight of the evidence." Ariz. R. Crim. P. 24.1(c)(1). On appeal, we do not

---

[4]　　　　Nash asserts "there was information in the record showing that [he] did not use CBB funds for the house or ring." He cites an excerpt from a deposition in his bankruptcy proceeding, where he states that he used his wife's money for the ring upgrade and that a friend loaned him money for the house. Evidence is not irrelevant or prejudicial merely because it is disputed. Nash was free to introduce evidence at trial that the funding came from separate sources. He has not shown error.

[5]　　　　Nash also argues the court erred in denying his motion for new trial based on three other grounds argued in the motion. Because we addressed (and rejected) those grounds in Sections I–III, we do not revisit them.

reweigh the evidence. *State v. Fischer*, 242 Ariz. 44, 52, ¶ 28 (2017). Instead, we decide "whether, resolving every conflict in the evidence in support of the order, substantial evidence supports the trial judge's order." *Id.*

¶53　　To support Nash's conviction, the State was required to prove that: "(1) pursuant to a scheme or artifice to defraud, (2) [he] knowingly obtained any benefit, (3) by means of false or fraudulent pretenses, representations, promises, or material omissions." *See Griffin*, 250 Ariz. at 656, ¶ 17 (citing A.R.S. § 13-2310(A)). The trial court found that the State met its burden of proof because it "demonstrated that [Nash] omitted material information from CBB to continue to obtain checks from CBB, i.e., that [MBS] had placed restrictions on which titles [Nash] could obtain" and Nash's "benefit was that he received checks from CBB for his company."

¶54　　Contrary to Nash's assertion, there was substantial evidence of his scheme to obtain payment for MBS's cars from CBB before paying MBS for them. We also reject his argument that the State failed to prove he personally benefitted from the scheme because "there was no forensic accounting." The evidence showed that payments for 17 cars were deposited in Kofa's bank account for a total of $569,300, and Nash never paid CBB or MBS for those cars. It was the jury's role to decide whether to believe that evidence.

¶55　　Nor do we find persuasive Nash's contention that "there was no evidence of a misrepresentation or material omission" because he received funds from CBB "through his established course of dealing with them." He argues this case is analogous to *State v. Johnson*, 179 Ariz. 375, 376 (1994), where the defendant was hired as a truck driver and used company-issued gas cards for personal gas purchases. Our supreme court vacated the conviction, concluding that the defendant had not made any false pretenses or misrepresentations, instead he breached the implied trust of his employer, which was not sufficient for fraudulent schemes and artifices. *Id.* at 379–81. Here, there was evidence that Nash made false representations to Nall that he would deliver titles within a day or two of picking up checks.

¶56　　Finally, the evidence showed that Nash was aware of MBS's policy requiring him to pay for outstanding titles before obtaining newer titles and did not inform CBB of that policy. Therefore, the jury could reasonably conclude that Nash obtained the checks from CBB, knowing he could not deliver those titles within a couple of days as promised. Because the verdict was supported by substantial evidence, we conclude the court did not abuse its discretion in denying Nash's motion for new trial.

## CONCLUSION

¶57        We affirm Nash's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED:      TM